**DELTA AIR LINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Air Line Pilots Association and COSTHA, Council for Safe Transportation of Hazardous Articles, Intervenors (two cases).

**EASTERN AIR LINES, INC. and Frontier Airlines, Inc., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

Air Line Pilots Association and COSTHA, Council for Safe Transportation of Hazardous Articles, Intervenors.

**ALLEGHENY AIRLINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD, Air Line Pilots Association and COSTHA, Council for Safe Transportation of Hazardous Articles, Intervenors.**

Nos. 74–1984, 75–1267 to 75–1269.

United States Court of Appeals, District of Columbia Circuit.

Argued 24 Feb. 1976.

Decided 22 June 1976.

As Amended 19 Aug. 1976.

Rehearing Denied 20 Aug. 1976.

Atlanta, Ga., Joseph F. Healy, Miami, Fla., David N. Brictson, Denver, Colo., and Edwin I. Colodny, Washington, D. C., were on the brief for petitioners.

Daniel M. Katz, Washington, D. C., with whom Gary Green, Washington, D. C., was on the brief for intervenor, Air Line Pilot Ass'n, Intern.

David E. Bass, Atty., C. A. B., Washington, D. C., with whom James C. Schultz, Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, Robert L. Toomey, Atty., C. A. B., Carl D. Lawson and Samuel R. Simon, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondent. Thomas J. Heye, Gen. Counsel, C. A. B., Washington, D. C., at the time the record was filed, and O. D. Ozment, Deputy Gen. Counsel, C. A. B., Washington, D. C., also entered appearances for respondent.

Lawrence W. Bierlein, Washington, D. C., for intervenor COSTHA.

Before MacKINNON and WILKEY, Circuit Judges, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This consolidated appeal challenges five orders of the Civil Aeronautics Board (CAB) relating to tariff revisions filed by four airline companies.[1] These tariff revisions provided that the air lines would not transport various items designated as "dangerous articles" by the Federal Aviation Administration (FAA) and the Department of Transportation (DOT).[2] In the chal-

Robert Reed Gray, Washington, D. C., with whom John E. Gillick, Jr., Washington, D. C., James W. Callison, Frank F. Rox,

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The four petitioners are Delta Air Lines, Inc., in Nos. 74–1984 and 75–1267; Eastern Air Lines, Inc., and Frontier Airlines, Inc., in No. 75–1268; and Allegheny Airlines, Inc., in No. 75–1269. (Hereinafter petitioners will also be referred to as "the carriers" and "the air lines.") There are two intervenors in this appeal. The Air Lines Pilots Association, Interna-

tional (ALPA), has intervened in support of petitioners. The position of the second intervenor, the Council for Safe Transportation of Hazardous Articles (COSTHA), generally supports the Board's orders.

2. "Dangerous articles" and "hazardous materials" are interchangeable terms used to describe cargo considered too dangerous to be shipped in unregulated fashion. Thus, 14 C.F.R. § 103.-1(b) (1976) of the FAA's regulations defines

lenged orders the CAB rejected (or reserved the right to reject) petitioners' tariffs on the ground that they were inconsistent with a Board regulation which requires tariff rules governing the carriage of hazardous cargo to conform with applicable FAA/DOT safety regulations.[3]

The petitioning carriers challenge the rejection procedures employed by the CAB, because under the Federal Aviation Act (the Act)[4] the Board can prevent a properly filed tariff from going into effect and prescribe a lawful tariff only by following the suspension and investigation procedures of section 1002.[5] Accordingly, the carriers ask this court to set aside the orders relating to their tariffs insofar as these orders (1) reject the tariffs, (2) reserve a right to reject the tariffs after effectiveness, (3) reject the tariffs after effectiveness, or (4) direct the air lines to conform their tariffs to a pending rulemaking proceeding.

The Board, on the other hand, claims authority under section 403 of the Act[6] to support its rejection of the tariffs.

We agree with the position of the carriers. The Federal Aviation Act does not authorize the rejection procedures employed by the CAB in these proceedings.

For clarity we should set forth several matters at the outset which will be more fully developed by our analysis later in the opinion. The issue here is not what the CAB will ultimately approve as the proper substantive content for the tariffs finally put into effect. The issue is whether the CAB must proceed under section 1002 with due notice, hold a hearing, and receive evi-

dence bearing on a number of factors which the carriers contend have never been considered by the CAB. The contention of the CAB that such a hearing would be a futile exercise is answered by an analysis of the distinct functions and responsibilities of the Department of Transportation and Federal Aviation Administration on the one hand and the Civil Aeronautics Board on the other.

To anticipate our conclusions a bit, the FAA (part of the DOT) decides what the air lines *may* carry under *safety* regulations, which the FAA determines by rulemaking devoted to questions of safety. The CAB decides what the air lines *must* carry under their certificates of convenience and necessity and their obligations as common carriers; in making this determination, which must fall within the outer perimeters of safety marked out by the FAA, the CAB considers economic and other evidence.

We have stated these conclusions generally, but they will be useful to have in mind as we proceed to a detailed consideration of the rather intricately interrelated roles of the CAB and the FAA.

## I. THE STATUTORY FRAMEWORK

### A. *The Federal Aviation Act*

Sections 403, 404, and 1002 of the Federal Aviation Act establish the general ratemaking scheme administered by the CAB.

■ Of these sections, only section 403(a) could possibly authorize "rejection" of the tariffs filed by the air carriers in this case.[7]

"dangerous articles" as "the material defined and regulated in the applicable regulations of the Department of Transportation (49 CFR Parts 170–189) . . . ." These DOT regulations include within their coverage, *inter alia,* explosives; flammable liquids and solids; oxidizing materials; corrosive liquids; compressed gases; poisons; etiologic agents; and radioactive materials. For a detailed listing of hazardous materials subject to DOT regulations see 49 C.F.R. § 172.5 (1975).

3. Order 74–9–14, Joint Appendix (J.A.) at 8 (5 Sept. 1974) (Delta); Order 75–1–124, J.A. at 11 (29 Jan. 1975) (Delta); Order 75–2–105, J.A. at 14 (26 Feb. 1975) (Eastern and Frontier); Order

75–3–13, J.A. at 17 (6 Mar. 1975) (Allegheny); Order 75–4–75, J.A. at 20 (15 April 1975) (Delta, Eastern, and Frontier). The Board regulation requiring "conformity" with FAA/DOT safety regulations is 14 C.F.R. § 221.38(a)(5) (1976).

4. 49 U.S.C. § 1301 *et seq.* (1970).

5. 49 U.S.C. § 1482 (1970).

6. 49 U.S.C. § 1373 (1970).

7. Section 1002(j) of the Act, 49 U.S.C. § 1482(j) (Supp. IV, 1974), which authorizes the Board, after hearing, to reject tariffs relating to *foreign*

It requires every air carrier to file with the CAB tariffs "showing all rates, fares, and charges for air transportation" and "showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation." These tariffs must "be filed, posted, and published *in such form and manner, and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff so filed which is not consistent with [section 403] and such regulations.* Any tariff so rejected shall be void. . . ."[8]

Additionally, subsection (c) of section 403 provides that "[n]o change shall be made in any rate, fare, or charge, or any classification, rule, regulation, or practice affecting such rate, fare, or charge, . . . specified in any effective tariff . . . , except after thirty days' notice of the proposed change filed, posted, and published in accordance with subsection (a) of this section. . . ."[9] Pursuant to section 403 the Board has adopted regulations which, insofar as they are relevant here, provide that each tariff shall contain:

> The rules and regulations relating to the transportation of explosives and other dangerous or restricted articles, showing the articles which are not acceptable for transportation as well as those articles which are acceptable for transportation only when specified packing, marking, and labeling requirements have been met. Such rules and regulations shall further

provide the specified packing, marking, and labeling requirements. *All such provisions shall be in conformity with Part 103 of the Federal Aviation Aegulations [sic]* (14 CFR Part 103) (as amended or revised from time to time), including those portions of the Interstate Commerce Commission Regulations for Transportation of Explosives and Other Dangerous Articles which are referred to in Part 103 of the Federal Aviation Regulations (14 CFR Part 103). . . .[10]

This CAB regulation illustrates one of many points at which the responsibilities of the CAB and the FAA interrelate. "Part 103 of the Federal Aviation [R]egulations," with which the carriers' tariffs must conform, sets forth the FAA/DOT safety regulations applicable to hazardous cargo. These regulations are promulgated pursuant to section 601 of the Federal Aviation Act, which charges FAA/DOT with the "duty to promote safety of flight of civil aircraft in air commerce . . . ."[11] To this end, Part 103 of the Federal Aviation Regulations prescribes a comprehensive set of "rules for loading and carrying dangerous articles and magnetized materials in any civil aircraft in the United States and in civil aircraft of United States registry anywhere in air commerce."[12] These rules impose packing, marking, and labeling requirements,[13] as well as restrictions on the types and quantities of dangerous articles that may be transported by passenger and cargo-only aircraft.[14] They also place special restrictions on radioactive, magnetized,

air transportation, is not relevant even if some of petitioners' tariffs relate to foreign transportation since the Board has never held a hearing on the tariffs.

**8.** 49 U.S.C. § 1373(a) (1970) (emphasis added). In its brief the CAB seems to suggest that the term "information" as used in section 403(a) permits the Board to impose substantive ratemaking requirements via the rejection procedure of the Act. Brief for Respondent at 4 & 23–25. We vigorously deny the existence of any such authority. To sanction this erroneous interpretation urged by the CAB, would permit the Board to issue *substantive* ratemaking requirements in 14 C.F.R. Part 221, to require future tariffs to contain "information" con-

forming to these requirements, to reject tariffs not providing such "information," and, thereby, to circumvent completely the ratemaking procedures of the Act.

**9.** 49 U.S.C. § 1373(c) (1970).

**10.** 14 C.F.R. § 221.38(a)(5) (1976) (emphasis added).

**11.** 49 U.S.C. § 1421(a) (1970).

**12.** 14 C.F.R. § 103.1(a) (1976).

**13.** 14 C.F.R. §§ 103.11 & .13 (1976).

**14.** C.F.R. §§ 103.7, .9, & .19 (1976).

and poisonous materials, including additional packing and marking requirements and instructions on where such cargo must be stowed in an aircraft.[15]

■ Summarizing the most important aspects of section 403 and its underlying regulations, we repeat that no other relevant statutory provision authorizes "rejection," and section 403 itself strictly limits the use of this authority to tariff filings that are inconsistent with (1) the form and information requirements of section 403 or (2) the Board's regulations (14 C.F.R. Part 221 (1976)) establishing the proper form and manner for filing, posting, and publishing tariffs. In other words, section 403 only authorizes rejection for technical deficiencies in the form, the manner of filing, and the information content of proposed tariffs.[16]

For our purposes, the second important statutory provision affecting CAB responsibilities is section 404(a), which, in relevant part, charges every air carrier holding a certificate of public convenience and necessity with a duty [1] "to provide and furnish . . . air transportation, as authorized by its certificate, upon reasonable request therefor . . .; [2] to provide safe and adequate service, equipment, and facilities in connection with such transportation; [and] [3] to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, and just and reasonable classifications, rules, regulations, and practices relating to such air transportation. . . ."[17]

■ Next, section 1002 sets forth the Board's authority with respect to investigating and suspending tariffs which raise substantive concerns. This section gives the Board the following authority over "new," as opposed to initial, tariffs (i. e., tariffs which state a rate, rule, or regulation different from that in an existing, effective tariff covering the same service): First, the Board is empowered to enter upon an investigation and hearing concerning the lawfulness of such tariffs.[18] Then, pending this hearing, the Board *may* suspend the operation of the new tariff (for a maximum period of 180 days) by filing a written statement of reasons.[19] *This provision for suspension represents the only means by which a properly-filed, new, proposed tariff can be prevented from going into effect.* Finally, *after* notice and hearing (whether completed before or after the tariff goes into effect) and upon a finding of unlawfulness, the Board can *then* determine and prescribe the lawful rate, rule, or regulation.[20]

■ One last section of the Federal Aviation Act, section 1111(a), merits a moment's attention even though it is not part of the Act's basic ratemaking scheme. This section provides, in pertinent part,

Subject to reasonable rules and regulations prescribed by the Administrator, any . . . carrier may . . . refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.[21]

■ In a recent decision involving embargo notices (instead of tariff revisions)[22] which were filed by each of the petitioners in this case, the Second Circuit concluded that section 1111(a) could not support "the

15.  14 C.F.R. §§ 103.29, .31, & .35 (1976).

16.  As we will discuss in greater detail *infra,* rejection is also appropriate "where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold . . .." *Municipal Light Bds. v. FPC,* 146 U.S.App.D.C. 294, 450 F.2d 1341, 1346 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972).

17.  49 U.S.C. § 1374(a) (1970).

18.  49 U.S.C. § 1482(b) & (g) (1970).

19.  49 U.S.C. § 1482(g) (1970).

20.  49 U.S.C. § 1482(d) & (g) (1970).

21.  49 U.S.C. § 1511(a) (Supp. IV, 1974).

22.  We discuss this decision in greater detail and compare the two procedural devices, tariffs and embargoes, *infra* at 33–35.

broad interdiction of cargo embraced in [petitioners'] embargoes." [23] As to petitioners' tariffs, we reach the identical conclusion. Section 1111(a) only authorizes ad hoc refusals to carry, i. e., where there has been a "determination that some particular freight for some specific reason presents a peril to safe flight;" [24] it does not embrace blanket boycotts of certain types of hazardous cargo via either the embargo or the tariff route.[25]

## B. The Transportation Safety Act

In addition to the Federal Aviation Act and its underlying regulations, Congress in the Transportation Safety Act of 1974 enacted new legislation designed "to improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." [26] This Act grants additional authority to the Secretary of Transportation over the safe transportation of hazardous materials, but, importantly, it does not give the Secretary or the CAB any authority to *require* the transportation of such materials.

While the Transportation Safety Act is primarily concerned with transportation in general, one of its provisions, section 108, deals specifically with the problem of transporting radioactive materials on passenger aircraft. Section 108 requires the Secretary of Transportation to promulgate regulations which "prohibit any transportation of radioactive materials on any [passenger] aircraft unless [1] the radioactive materials involved are intended for use in, or incident to, research, or medical diagnosis or treatment, [and] [2] . . . such materials as prepared for and during transportation do not pose an unreasonable hazard to health and safety." [27]

In compliance with this directive, new regulations were issued on 12 April 1975 which permit the transportation of radioactive materials on passenger aircraft if they are "intended for use in, or incident to, research, or medical diagnosis or treatment . . . ." [28] In adopting these regulations, FAA/DOT explicitly rejected any notion that the term "research" (as used in section 108 of the Transportation Safety Act and in the new regulations) should be interpreted to mean "medical research," i. e., to exclude those materials intended for use in, or incident to, nonmedical research.[29]

**23.** *Air Line Pilots Ass'n, Int'l (ALPA) v. CAB,* 516 F.2d 1269, 1276 (2d Cir. 1975).

**24.** *Id.* at 1276 (footnote omitted). For an example of such a permissible ad hoc application of section 1111(a) see *Williams v. Trans World Airlines, Inc.,* 509 F.2d 942 (2d Cir. 1975), sanctioning the right of a carrier to refuse to carry a would-be passenger on the basis of information that he was dangerous and had a propensity for violence, a criminal record, and a history of mental instability.

**25.** The Second Circuit also concluded that it is implicit in the prefatory language of section 1111(a) and the FAA/DOT safety rules that "goods marked, labelled, packaged and stowed in accordance with such rules, are not inimical to flight safety . . . ." within the meaning of section 1111(a). 516 F.2d at 1276. It is important to recognize that by this conclusion the Second Circuit holds only that Congress has subjected the prerogative of the carriers—the prerogative to refuse to transport hazardous materials *pursuant to section 1111(a)'s authorization*—to the reasonable rules and regulations prescribed by FAA/DOT. The court does *not* hold that Congress has subjected the carriers' prerogative to file tariffs (or even to file

embargoes) to the FAA/DOT regulations, i. e., that the regulations *require* carriers to transport all complying articles. While we do not disagree with the Second Circuit's conclusion with regard to the limiting nature of section 1111(a)'s prefatory language, given the facts of our case we need not reach this issue. As to tariffs and section 1111(a), we hold only that Congress has subjected the carriers' prerogative to transport hazardous materials (*not* their prerogative *to refuse* to transport the same) to the reasonable safety regulations of FAA/DOT, i. e., these rules and regulations establish the *outer* perimeters of safety. *See infra* at 22–26.

**26.** 49 U.S.C. § 1801 (Supp. IV, 1974).

**27.** 49 U.S.C. § 1807 (Supp. IV, 1974).

**28.** 14 C.F.R. § 103.7(b)(6) (1976).

**29.** In the new FAA/DOT regulations "research" is defined as "investigation or experimentation aimed at the discovery of new theories or laws, and the discovery and interpretation of facts or revision of accepted theories or laws in the light of new facts." 14 C.F.R. § 103.1(d)(2) (1976). Leaving no doubt as to

■ Hence, it is clear that the Transportation Safety Act and its underlying regulations do not *prohibit* the transportation of radioactive materials related to *non*human medical research. It is equally apparent, however, that this Act does not *require* air lines to carry these materials.

## II. THE ORDERS UNDER REVIEW

1. *Order 74–9–14*—Prior to enactment of the Transportation Safety Act of 1974, petitioner Delta filed a tariff revision (*i. e.,* a "new" tariff under section 1002) proposing new rules governing its carriage of radioactive materials. This tariff proposed to restrict Delta's acceptance of radioactive materials to those which the shipper certified in writing as:

. . . (1) intended to be administered to humans for diagnostic or therapeutic medical purposes; (2) to be used in the analysis, for medical purposes, of biological materials from humans; or (3) essential to the conduct of medical research having direct application to human medical welfare.[30]

Additionally, Delta proposed not to accept individual packages of radioactive materials having a Transport Index (a measurement of radiation dose rate) in excess of 5.0.[31] Finding Delta's proposed restrictions "considerably more stringent than either existing provisions or recommended revisions of the FAA's regulations," the Board rejected this tariff in the first order now under review.[32]

2. *Order 75–1–124*—Following enactment of the Transportation Safety Act, but before FAA/DOT proposed amended regulations in accordance with section 108's mandate,[33] Delta filed another tariff modifying its rules concerning the transportation of radioactive materials. In the second tariff Delta omitted the provision establishing a 5.0 Transportation Index limitation, and this time the Board decided not to reject. Instead, in the second order here under review, the Board explained,

Pursuant to [the Transportation Safety Act], enacted January 3, 1975, the Secretary of Transportation is required to issue, within 120 days of the passage of the law, regulations prohibiting any transportation of radioactive materials on any passenger-carrying aircraft "unless the radioactive materials involved are intended for use in, or incident to, research, medical diagnosis, or treatment, so long as such materials as prepared for and during transportation do not pose an unreasonable hazard to health and safety."

. . .

The Board has previously accepted in principle the primary responsibility of the DOT for regulations on the transportation of hazardous materials, including radioactive materials, by air. While we cannot forecast precisely what regulations will be instituted by the DOT, it

---

the intent of this definition, the statement preceding the new regulations explained:

Certain of the comments received reveal that there is a difference of opinion among interested persons as to whether the term "research" used in section 108(a) of the Act must be construed to permit the transportation of passenger-carrying aircraft of only those radioactive materials intended for use in, or incident to "medical research", thereby excluding those materials intended for use in, or incident to, nonmedical research.

The FAA has carefully reviewed Section 108 of the Act and is of the opinion, upon consideration of the syntax and punctuation of the sentence involved and its legislative history, that the term "research" used in section 108(a) must be given a statutory meaning which encompasses radioactive materials intended for use in, or incident to, nonmedical research as well as medical research. However, the term "research" as proposed in the notice has been revised in this amendment.to make it clear that research includes investigation and experimentation aimed at the discovery of new theories or laws as well as their revision.

40 Fed.Reg. 17141 (1975).

30. Order 74–9–14, J.A. at 8 (5 Sept. 1974).

31. *Id.*

32. *Id.,* J.A. at 9.

33. These new regulations are discussed briefly *supra* at —— of 177 U.S.App.D.C., at 256 of 543 F.2d.

appears that Delta's proposal is generally consistent with the intent of [the Transportation Safety Act.] [34]

Accordingly, the Board deferred action on the complaints advocating rejection filed by the American Medical Association and the American College of Radiology until after adoption of regulations pursuant to section 108 of the Transportation Safety Act.

Several days after the adoption of this deferral order, FAA/DOT issued a notice of proposed rulemaking. [35] Like the final regulations published on 17 April 1975, these proposed rules construed the term "research" in section 108 as including nonhuman, nonmedical research, meaning that carriage of radioactive materials intended for general research would be permissible so long as packing, marking, and labeling requirements, and related rules governing inspection and scanning, were met. [36]

3. *Order 75–2–105*—Before commencement of the FAA/DOT rulemaking proceedings, petitioners Eastern and Frontier filed revised tariffs covering the shipment of radioactive materials. These filings mirrored the second Delta tariff, thus excluding the carriage of radioactive materials not intended for human-related medical research. Although following the lead of its second Delta order and again deferring action on a complaint requesting rejection (this one filed by FAA/DOT), the Board noted that the Eastern-Frontier filings and other similar tariffs already in effect (*e. g.*, Delta's) appeared "more narrow in scope with respect to allowed radioactive 're-

search' and medical materials than as proposed in the FAA rulemaking." Accordingly, in this, the third order under review, the Board stated that it "expect[ed] the carriers promptly to conform their tariff provisions to the FAA proposed rulemaking." [37]

4. *Order 75–3–13*—Shortly after the Eastern-Frontier deferral order, petitioner Allegheny filed a tariff revision related to poisonous, instead of radioactive cargo. The Allegheny tariff completely banned the carriage of materials labeled "Poison B." [38] Recognizing that "Allegheny's proposal . . . would be more restrictive than current FAA Regulations, as well as rules currently proposed by FAA . . .," the CAB decided in the fourth order at issue in this proceeding to "reject Allegheny's proposal without prejudice to the carrier's refiling tariff provisions reflecting FAA's proposed rules." [39] The Board also expressed its "expect[ation] that other carriers that currently have in effect tariffs refusing to accept Poison B materials will promptly conform their tariffs to the proposed FAA Regulations." [40]

5. *Order 75–2–127*—The final order challenged by petitioners [41] involves not only tariff revisions (some proposed and some effective) but also embargo notices, under which fifteen air lines, including petitioners, attempted to accomplish through other means the same result proposed under their tariff revisions—the exclusion of certain hazardous cargo not banned by FAA/DOT's safety regulations (proposed or effective). The Board, in an order not un-

---

**34.** Order 75–1–124, J.A. at 12 (29 Jan. 1975) (footnote omitted).

**35.** 40 Fed.Reg. 5168 (1975).

**36.** *See supra* at —— of 177 U.S.App.D.C., 253–254 of 543 F.2d.

**37.** Order 75–2–105, J.A. at 16 (26 Feb. 1975).

**38.** As the Board explains,

Poisonous articles, Class B, are substances, liquid or solid, which are known to be so toxic to man as to afford a hazard to health during transportation, or which, in the absence of adequate data on human toxicity, are presumed to be toxic to man.

It should be noted that Section 103.35 of the Federal Aviation Regulations provides that no operator of any aircraft may carry material marked as or known to be Poison B in the same cargo compartment with material known to be foodstuffs, feeds, or other edible material intended for consumption by humans or animals.

Order 75–3–13, J.A. at 17 n.2 (6 Mar. 1975).

**39.** *Id.,* J.A. at 18.

**40.** *Id.*

**41.** Order 75–4–75, J.A. at 20 (15 April 1975).

der review in this proceeding,[42] rejected these embargo notices, ruling that its embargo regulations [43] do not embrace blanket refusals (on safety grounds) to transport shipments of hazardous materials which satisfy applicable FAA/DOT safety regulations. Intervenor, Air Line Pilots Association, International (ALPA), sought reconsideration of this rejection order and a stay pending judicial review, but both requests were denied: on 19 March 1975 the Board denied the motion for a stay,[44] and on 15 April 1975 the petition for reconsideration was denied.[45]

6. *Order 75–3–61*—In the 19 March order denying ALPA's motion for a stay, a second order not here under review, the CAB clarified the theory behind its rejection of the carrier's embargo notices:

> Contrary to the implication in ALPA's petition, the Board has not purported to determine whether the DOT/FAA regulations are minimum, or minimum and maximum standards, nor was the order premised on any theory that the airlines' obligation to carry traffic stems from those regulations. Rather, the Board considers that a carrier's refusal to carry traffic tendered in accordance with the safety regulations is inconsistent with its statutory obligation to provide adequate service, and with its duties assumed in the acceptance of a certificate of public convenience and necessity.[46]

This order is relevant for our purposes only because the CAB contends that petitioners' tariff provisions present essentially the same problems as their embargoes and are therefore subject to the same analysis.[47]

Six days after the Board denied ALPA's motion for a stay, the Second Circuit granted a stay pending appeal, and ordered an expedited handling of the case on the merits. On 27 May 1975 the Second Circuit affirmed the CAB's rejection of the embargo notices.[48]

7. *Order 75–4–75*—The 15 April order, twice referred to above in paragraph 5, is the final order challenged by petitioners in this proceeding. Besides embargo notices, this order also dealt with all hazardous cargo tariffs still pending before the CAB, i. e., the proposed tariff revisions on which the Board had not yet acted and those as to which the question of rejection had been deferred. This latter category included, of course, the already-effective tariffs of Delta, Eastern, and Frontier.[49] As to tariffs, Order 75–4–75 concludes,

> The tariff provisions proposed or in effect for [the carriers] that restrict the carriage of hazardous materials permitted by present or proposed DOT/FAA Regulations present essentially the same problems as discussed . . . for embargoes. However, as to refusals to carry hazardous articles pursuant to tariffs, the Board must defer to the position of DOT/FAA to the effect that freight which complies with FAA Regulations *must* be accepted for carriage by the carriers, and that Section 1111 does not permit their refusal. These tariffs are not consistent with Section 221.38(a)(5) of the Board's Economic Regulations and will be rejected pursuant to the provisions of Section 403 of the Act and subpart O of Part 221 of the Board's Regulations.[50]

---

42. Order 75–2–127 (28 Feb. 1975) (reproduced in Appendix B of Brief for Respondent).

43. 14 C.F.R. Part 228 (1976).

44. Order 75–3–61 (19 Mar. 1975) (reproduced in Appendix C of Brief for Respondent).

45. Order 75–4–75, J.A. at 20 (15 April 1975).

46. Order 75–3–61 (19 Mar. 1975) (reproduced in Appendix C of Brief for Respondent at C–2).

47. *See* Order 75–4–75, J.A. at 23 n.4 & 26 (15 April 1975).

48. *ALPA v. CAB,* 516 F.2d 1269 (2d Cir. 1975).

49. Before their effective date, the Board rejected the proposed tariffs of Delta and Allegheny in Order 74–9–14, J.A. at 8 (5 Sept. 1974) and Order 75–3–13, J.A. at 17 (6 Mar. 1975), respectively. In Order 75–4–75, J.A. at 20 (15 April 1975), the Board rejected already-effective tariffs filed by Delta, Eastern, and Frontier.

50. Order 75–4–75, J.A. at 26 (15 April 1975) (emphasis added). "[S]ubpart O of Part 221 of the Board's Regulations", 14 C.F.R. § 221.-180–.184 (1976), sets forth the CAB's interpretation of its rejection authority under section

## III. THE REGULATORY SCHEME

■ Important to an understanding of the issues in this case is an overall view of the regulatory scheme designed by Congress to govern civil air transportation. As we have already pointed out, the Federal Aviation Act of 1958 established a bifurcated regulatory scheme entrusting two distinct agencies with different responsibilities in this area: FAA/DOT bears the primary responsibility for safety regulation while the CAB administers and enforces the economic provisions of the Act. After conducting rulemaking proceedings devoted almost exclusively to questions of air safety, the FAA promulgates regulations which determine what airline carriers *may* carry. The CAB, on the other hand, evaluates other relevant evidence such as the specific economics of various types of cargo and then determines what carriers *must* carry under their certificates of convenience and necessity in order to comply with their common law and statutory obligations as common carriers.

This separation of functions and responsibilities helps explain why we conclude that the CAB should have afforded the carriers a hearing on their tariffs (under the suspension and investigation procedures of section 1002) and why such a hearing would not have been a futile exercise. During the FAA/DOT rulemaking proceedings that produced the safety regulations involved in this case, Delta and the other air lines which chose to appear could not properly raise questions relating to (1) their common law and statutory obligations as common carriers or (2) the specific economic costs involved in transporting various hazardous materials. Under the Federal Aviation Act

these and similar issues are reserved for the CAB and are, therefore, still unresolved.

■ Turning to the first of these issues, we note that under common law a "common carrier" was an entity that held itself out indiscriminately to the clientele it was suited to serve.[51] Thus, air lines that hold themselves out to serve only a certain class of the public (shippers who do not ship dangerous articles) and to carry only a limited class of cargo (nonhazardous materials) are nonetheless "common carriers" under common law. The essential element is the offer to transport anything for anyone within the limitations specified.[52] To be sure, however, the extent to which the airline carriers of today have a right to delineate what they will carry and for whom depends not only upon their common law responsibilities as common carriers, but also upon the statutory obligations and regulatory powers created by the Federal Aviation Act.[53]

■ Economic cost is the second important issue which should be carefully explored during an investigation and hearing pursuant to section 1002. Assuming that the CAB has the power to order air lines to carry all hazardous cargo that complies with FAA/DOT safety regulations, the Board should at least consider the economic ramifications of such an order, *e. g.,* the cost of training special personnel to handle and inspect dangerous articles, the cost of creating special segregated areas at airports and on airplanes to accommodate such cargo, and the cost of inspecting all cargo to make sure that it complies with the safety standards prescribed by FAA/DOT. In addition, the Board should compare the

403 of the Federal Aviation Act and establishes appropriate procedures. Specifically, section 221.180 of the regulations provides,

> Under the terms of section 403(a) of the act, the Board is empowered to reject any tariff publication which is not consistent with section 403 of the act or with regulations in this part.

**51.** For a discussion of common carrier obligations under common law, see this court's decision in *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630, 640–42 (D.C.

Cir.1976), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54, 44 U.S.L.W. 3663 (1976).

**52.** "[A] carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." *Id.* at 641, *citing Semon v. Royal Indem. Co.,* 279 F.2d 737, 739–40 (5th Cir. 1960).

**53.** *E. g.,* section 404(a), 49 U.S.C. § 1374(a) (1970).

costs and benefits of carrying hazardous cargo by air with the costs and benefits of alternate means of transportation, e. g., railroad, highway, and water. In any event, since both economic cost and common carrier responsibility are issues which are reserved, in the first instance, for the CAB, we note only the need to address these matters at a hearing and express no view on their proper resolution.

A third issue, which according to the carriers should be considered by the CAB, is safety itself. On this point we generally disagree with the air lines; safety has already been determined by the agencies charged with primary responsibility in this area, the FAA and the DOT. While the CAB is instructed by section 102 of the Federal Aviation Act to "consider . . . as being in the public interest, and in accordance with the public convenience and necessity: . . . [1] The regulation of air transportation in such a manner as to . . . assure the highest degree of safety in . . . such transportation . . [and] [2] The promotion of safety in air commerce . . .," [54] it is clear to us that the Board fulfills its responsibilities with respect to safety questions when it determines that all FAA/DOT safety requirements have been satisfied. [55] Perhaps under section 102 the Board retains a small residue of authority over safety issues whereby it could impose hazardous cargo standards stricter (but not more lenient) than those of FAA/DOT, [56] yet in general we believe that the Board should defer to the safety expertise of its sister agencies and accept the FAA/DOT position on safety as establishing both an inner and an outer limit on its safety jurisdiction.

Putting this all together, we envision the following four-step hearing before the CAB:

First, since the FAA is the agency with primary responsibility for air safety regulation, during the suspension proceeding on petitioners' tariffs the CAB should obtain in writing the FAA's authoritative position on the safe transportation of each category of hazardous materials excluded by the air line's tariffs. [57] This FAA position statement should embody the Agency's present thinking on safety, including its currently effective or most recently proposed safety regulations. The FAA report, which should be made a matter of public record at the suspension proceeding, will then determine at least the outer limits of CAB discretion on all safety issues; no air line can be required to carry articles more hazardous than the most dangerous articles permitted by the FAA.

Second, since the FAA is not concerned with economic questions, it remains for the CAB to strike a balance between what the air lines possibly could carry without jeopardizing the safety of their passengers and crew, and what it would cost the carriers to undertake the transportation of all such cargo, in comparison with alternate means of transportation.

Third, the Board will have to determine whether the air lines are under a common carrier obligation (statutory or common law) to carry some or all of the dangerous articles which comply with FAA/DOT safety criteria.

Finally, if the Board finds such a duty to carry, it will also have to determine to what extent it has the authority to enforce this

**54.** 49 U.S.C. § 1302(b) & (e) (1970).

**55.** See Air Line Pilots Ass'n, Int'l v. CAB, 161 U.S.App.D.C. 199, 494 F.2d 1118, 1127 (1974).

**56.** For example, if it turns out, as ALPA contends, that current safety regulations are not being adequately enforced by FAA/DOT, possibly the CAB has jurisdiction to permit the carriers, in the fulfillment of their common carrier obligation to exercise the highest degree of care toward their passengers (see Federal Aviation

Act § 404(a), 49 U.S.C. § 1374(a) (1970)), to force additional safety measures on the shippers through the medium of more restrictive tariffs. This is another question which the CAB will have to face, in the first instance, at a hearing on petitioners' tariffs.

**57.** See Air Line Pilots Ass'n, Int'l v. CAB, 161 U.S.App.D.C. 199, 494 F.2d 1118, 1127 n.33 (1974).

obligation by compelling air lines to carry specific materials.

Taking for example the tariff revisions filed by Delta, Eastern, and Frontier, we note that these air lines do not propose to preclude the carriage of all radioactive materials. Instead, they acknowledge that where human life is concerned the additional speed which only an airplane can supply justifies the acceptance of this dangerous cargo, even though passengers and crew will be subjected to increased risks and the air lines will be forced to incur additional expenses. By the same rationale, the air lines are not willing to accept radioactive materials not related to human medical research. Here, because speed is no longer as important of a factor and because there are substantial hazards and costs associated with the transportation of radioactive materials, the carriers argue that this cargo should travel by other means of transportation. Whether this contention is reasonable, whether the economic costs of transporting radioactive materials by air exceed those associated with other means of transportation, and the extent to which the CAB has the power (under common law or statute) to compel the carriage of all radioactive materials that comply with FAA/DOT safety standards, are several of the issues which the CAB can and should explore during an investigation and hearing pursuant to section 1002.

■ Since we hold that the CAB has a duty to conduct a hearing wherein it will consider economic costs, safety hazards (accepting the outer limits of safety as found by the FAA), common carrier responsibilities, and other factors affecting the transportation of hazardous cargo, we also recognize that the Board has at least some authority to compel the transportation of certain cargo. If, after conducting a hearing and determining that despite the economic costs and safety hazards involved certain types of cargo should be carried, the CAB had no power to enforce compliance with its conclusion, the hearing could serve no use-

ful purpose. Without a CAB hearing (and without the orders which we now set aside) petitioners would have an *option* to carry all hazardous cargo that complies with FAA/DOT safety regulations; with a hearing (assuming the Board is *not* authorized to mandate the carriage of specific materials) nothing would change—petitioners would have the same option to carry. Therefore, we conclude that once the Board holds a hearing and makes a determination, its directive must be obeyed unless and until it is set aside as unreasonable by a court of competent jurisdiction.

■ The CAB did not reject the tariffs at issue on this appeal for any technical or formal defect as prescribed under section 403. Instead, it rejected them for what the Board believed were substantive deficiencies. These rejections exceeded the limits of the Board's delegated authority under the Federal Aviation Act. Under the circumstances of this case rejection was not an alternative available to the Board under the Act. Absent a technical or formal defect relating to the filing, posting, or publication of a tariff, or a substantive defect that renders the tariff a substantive nullity, the Board can prevent a new, proposed tariff from becoming effective only by *suspending* it for a maximum period of 180 days, pending a *hearing* on its lawfulness. Contrary to the Board's determination, in petitioners' proposed tariffs we find no substantive deficiencies warranting rejection under section 403.

■ In our view, petitioners' tariffs were "in conformity with [14 C.F.R.] Part 103" [58] and, consequently, were "consistent with" [59] the Board's regulations—specifically, section 221.38(a)(5). We interpret section 403 of the Act and section 221.38(a)(5) of the Board's regulations to mean that carrier tariffs, when filed, can *not* provide for the carriage of materials which FAA/DOT *has banned* from air transportation. Thus, if a carrier were to file a new

---

**58.** 14 C.F.R. § 221.38(a)(5) (1976).

**59.** Federal Aviation Act, § 403(a), 49 U.S.C. § 1373(a) (1970).

tariff indicating that it would transport either materials banned by 14 C.F.R. Part 103 or articles not in compliance with the packing, marking, labeling, and storage requirements of 14 C.F.R. Part 103, such a tariff would, within the meaning of section 221.38(a)(5), not be "in conformity with Part 103," and would, therefore, within the meaning of section 403(a), not be "consistent with" the Board's regulations governing the form, the manner of filing, and the information content of tariffs. In such a case, peremptory rejection of the tariff as a substantive nullity would be appropriate under section 403. But here we have a very different case. Petitioners have filed tariffs which, according to the Board, are "more stringent," "more restrictive," and "more narrow in scope"[60] than the provisions of 14 C.F.R. Part 103 (proposed or effective), and therefore, in our view, are "in conformity with Part 103" and "consistent with" the Board's regulations. We do not construe the phrase "in conformity with" to mean "identical to."[61]

Summarizing our conclusions thus far, we hold that the CAB does not have the statutory power to define the phrase "in conformity with" in section 221.38(a)(5) of its regulations to mean "identical to," i. e., to require air carriers to transport every article which complies with FAA/DOT safety regulations *without first affording the carriers a hearing for the purpose of considering those issues reserved to the CAB, not the FAA.* This is the hearing to which they are entitled under section 1002. In keeping with the regulatory scheme established by Congress the phrase "in conformity with Part 103" must be interpreted to mean "not in violation of Part 103," otherwise the CAB would evade its statutory responsibilities to consider and decide those economic and other issues which are not to be (and were not here) considered by the FAA, but are statutorily reserved to the CAB.[62]

60. Order 74–9–14, J.A. at 9 (5 Sept. 1974); Order 75–3–13, J.A. at 18 (6 Mar. 1975); Order 75–2–105, J.A. at 16 (26 Feb. 1975).

61. In section 221.104 of its regulations governing the construction, publication, filing, and posting of tariffs, the Board also seems to recognize that "in conformity with" does not mean "identical to." This section provides that a separate governing tariff which covers explosives and other dangerous or restricted articles " . . . *may contain restrictions on the extent* to which participating carriers will accept for transportation such explosives and other dangerous or restricted articles." 14 C.F.R. § 221.104 (1976) (emphasis added).

62. The CAB's exact position on the impact of the FAA/DOT safety regulations is difficult to ascertain. Generally, however, the Board's conclusions seem to closely coincide with ours. In Order 75–4–75 the Board makes the following statements:

As the Board noted in Order 75–3–61 denying ALPA's request for a stay of Order 75–2–127, *the Board has not purported to determine whether DOT/FAA Regulations are minimum or minimum and maximum standards, nor was the order premised upon any theory that the airlines' obligations to carry traffic stems [sic] from those regulations.* Moreover, the Board has not ruled upon the question of the extent of the authority of an air carrier under Section 1111 to refuse to carry a particular shipment of hazardous goods based upon the circumstances relating specifically to that shipment.

. . . The Congress has subjected the prerogative of the carriers to refuse to transport hazardous materials to reasonable rules and regulations prescribed by the Administrator of FAA (Section 1111 of the Act). Title VI of the Act places the duty upon the Administrator to prescribe reasonable rules and regulations governing such practices as the Administrator may find necessary to provide for safety in air commerce. And the Administrator has prescribed at length what material *may* be carried in passenger-carrying aircraft as well as on all-cargo aircraft, the permissible amounts and packaging requirements therefor, what materials may not be carried, etc. (14 C.F.R. Part 103).

. . . The FAA Administrator having thus preempted this area of regulation, no basis remains to conclude that carriers are free to pick and choose their traffic. It is clear that Congress intended any carrier's refusal to transport property *for safety reasons* to be subject to reasonable rules and regulations prescribed by the FAA Administrator.

J.A. at 23–24 & n.4 (15 April 1975) (emphasis added).

If the Board here is only saying that it defers to the safety expertise of FAA/DOT and is not holding that the FAA/DOT regulations *require* the air lines to transport all articles that comply with those regulations, then we are in com-

Accordingly, we conclude that insofar as the five challenged orders (1) rejected petitioners' hazardous cargo tariffs, (2) purported to reserve a right to reject such tariffs after they became effective, (3) rejected such tariffs after they became effective, or (4) ordered petitioners to conform their tariffs to pending FAA/DOT rule-making proposals, they contravened the Federal Aviation Act's statutory scheme which permits the CAB to determine and prescribe a lawful tariff only after notice and hearing. We construe the Federal Aviation Act as authorizing the rejection of a tariff only (1) where technical requirements of form and order have not been satisfied and (2) "where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold . . . ."[63]

Having outlined the central rationale of our decision—the respective regulatory spheres defined for the CAB and FAA/DOT by Congress—we turn now to a brief examination of relevant caselaw.

## IV. RELEVANT CASELAW

The only judicial decision so far to interpret the CAB's rejection power under section 403 is *United Air Lines, Inc. v. CAB.*[64] There the court defined "[t]he sole issue presented" as "whether air carriers may file

plete accord. However, the Board really blinks reality when on the one hand it says that the FAA/DOT regulations do not *require* carriers to transport all complying articles (*i. e.,* when it says that it does not purport to determine whether the regulations establish "minimum or minimum and maximum standards"), and then it turns around and rejects out of hand all tariffs that do not precisely mirror those regulations. Our problem with the CAB's position is not that the Board chose to defer to FAA/DOT's safety determinations, but *how* it chose to do so. By not following the investigation and hearing procedures of section 1002, the Board has, in effect, deferred to FAA/DOT not only on questions of safety, but also on questions of economic cost and common carrier responsibility.

63. *Municipal Light Bds. v. FPC,* 450 F.2d at 1346; *accord, Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095, 1103 (1971) (emphasis added):

> We recognize . . . that an agency has the power and in some cases the duty to reject a tariff that is *demonstrably unlawful on its face.* Thus, an agency will reject a tariff that conflicts with a statute, agency regulation or order. . . .

The Board's contention that petitioners' tariffs were "demonstrably unlawful on [their] face" because they conflicted with section 404(a)'s statutory obligation to furnish "adequate" service is without merit. Section 404(a), while requiring carriers to furnish air transportation as authorized by their certificates, also requires carriers, as part of their common carrier obligations, "to provide *safe* and adequate service, equipment, and facilities." 49 U.S.C. § 1374(a) (emphasis added). Moreover, both the Act and the Board's regulations contemplate that the filing of tariffs is the appropriate means for establishing the limits of an air carrier's "holding out," in furtherance of both the carrier's

duty to provide safe and adequate service and the Board's duty to consider such factors as economic cost and common carrier responsibility.

We note also that the CAB does not always *reject* proposed tariffs which are more restrictive than FAA/DOT safety regulations. In Order 75–2–65 the Board considered tariff revisions filed by United Air Lines, which proposed to refuse to accept for transportation poisonous spiders, insects (excluding honey bees), and lizards. The shipment of these animals is not banned by current FAA/DOT regulations. Characterizing these proposed tariffs as "unreasonable" and "a significant *decrease in the* carrier's common-carrier obligation to transport," the Board nevertheless *suspended* the proposed tariffs pending investigation. Order 76–2–65 at 2 (18 Feb. 1976). In addition, the Board did not reject (nor had it earlier deferred the question of rejection with respect to) United's already-effective tariff provision excluding poisonous snakes from transportation. This provision, like the one dealing with poisonous spiders, insects, and lizards, was simply set for investigation.

Apparently, the Board feels that it has the discretion to suspend and/or investigate (*e. g.,* Order 76–2–65) or to reject (*e. g.,* the orders challenged herein) proposed tariffs, as it sees fit. We, however, do not interpret sections 403 and 1002 of the Federal Aviation Act in this manner.

64. 518 F.2d 256 (7th Cir. 1975). The Second Circuit in *ALPA v. CAB,* 516 F.2d at 1273 & 1274 n.7, *specifically* stated that the tariff rejection issues in Order 75–4–75, J.A. at 20 (15 April 1975), were not on review in that opinion and recognized that "[a]pparently, the tariff question will be considered in review proceedings pending in the District of Columbia Circuit, *Delta Air Lines, Inc. v. CAB,* No. 74–1984."

new and different tariffs while lawful tariffs *duly established by the Civil Aeronautics Board* remain in effect or whether under such circumstances the carriers [*sic*] only recourse is to seek to modify the Board-established tariffs." [65] In this case the Board *suspended and investigated* proposed fare changes between Hawaii and the mainland and prescribed certain fare levels and differentials as a result of its investigation. Five days after filing conforming tariffs, United filed new tariffs reflecting higher fares than those prescribed by the Board. After the Board *rejected* these new tariffs and subsequently denied United's petition for review, United sought review in the Seventh Circuit.

In deciding the narrow issue with which it was confronted, the Seventh Circuit affirmed the Board order denying review and stated, "We believe that Congress no more intended in the Federal Aviation Act than in the other three similar acts [the Interstate Commerce Act, the Packers and Stockyards Act, and the Natural Gas Act] to authorize the Board to establish a lawful rate only to be followed *immediately* by the necessity of passing upon other and different rates filed by the carriers." [66] Without expressing a view on the merits of this decision, we conclude that it is inapposite here. In the instant case the Board has neither conducted an investigation of the tariffs at issue nor prescribed, after hearing, the lawful tariff provisions for hazardous cargo. Rather, it has attempted to short-circuit totally the ratemaking provisions of the Federal Aviation Act, provisions which were observed and followed during the first round of the Seventh Circuit case. Therefore, the narrow issue decided in *United* furnishes little, if any, support for the Board's position here.

At best, *United* lends support to a proposition which this court has enunciated and which petitioners do not dispute—the proposition that "tariff rejection may be based on considerations which transcend the formal and the technical." [67] As Judge Leventhal recognized in *Municipal Light Boards v. FPC,* a case involving rate filings with the Federal Power Commission, "A 'rejection' of a filing . . . is appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest." [68] Although rejection

. . . is "a peremptory form of response to filed tariffs" which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order. Its use is not limited to defects of form. It may be used by any agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket.[69]

Thus, while *Municipal Light Boards* supports the Board's contention that rejection is appropriate in the case of some substantive deficiencies, it does not support the rejection orders here under review. Tariffs like those of petitioners, which raise difficult issues of economic cost and common carrier responsibility, can hardly be characterized as "substantive nullities." Accordingly, we conclude that in the orders at issue on this appeal the Board quite proper-

---

**65.** 518 F.2d at 257 (emphasis added).

**66.** *Id.* at 261 (emphasis added). The Seventh Circuit further stated, "Upon the merits we are persuaded that the Supreme Court treatment of cases arising under the Interstate Commerce Act, the Packers and Stockyards Act and the National [*sic*] Gas Act confirm the position adhered to by the Civil Aeronautics Board." *Id.* at 259, *citing Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 284 U.S. 370 (1932); *United States v. Corrick,* 298 U.S.

435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936); *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

**67.** Brief for Respondent at 22–23 (footnote omitted).

**68.** 450 F.2d at 1346.

**69.** *Id.* (footnote omitted); *accord, Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095, 1103 (1971).

ly refrained from making a finding that any tariff being rejected was "patently a nullity as a matter of substantive law."

In support of its orders, the Board places much reliance on the Second Circuit's decision in *Air Line Pilots Association, International (ALPA) v. CAB.*[70] In that case, however, the court carefully pointed out that the "rather narrow"[71] and "sole issue before [it was] whether the CAB order rejecting the air line *embargoes* was properly issued."[72] Describing this issue as "primarily procedural" and "only peripherally related to the question of effective regulation of hazardous material in flight,"[73] the Second Circuit found that "the CAB properly rejected the airline embargoes as inappropriate and inapplicable under the circumstances set forth."[74] Therefore, rather then relying upon and establishing common carrier responsibilities under common law or statute, this case hinged entirely upon the air lines' *procedurally* inappropriate choice of the embargo device.

Contrary to the contentions of both the Board and intervenor COSTHA, there are several important distinctions between achieving a cargo restriction through the mechanism of a tariff filing and achieving the same result through the means of an embargo. Under the embargo regulations prescribed by the Board, an embargo becomes effective immediately (as of the date provided in the carrier's notice) without any Board action; its duration is thirty days, and any extension requires Board approval (although pending a Board decision, the embargo may remain in effect).[75] In comparison with tariffs—which pursuant to section 403(c) must be filed at least thirty days prior to their effective date, thereby affording an opportunity for public comment and evaluation by the Board—embargoes may be unilaterally implemented by a carrier without either CAB action or an opportunity for public comment. Thus, the court's concern that a carrier, acting in accordance with the Board's embargo regulations, might be able to "disregard the entire regulatory scheme" (which, in turn could "lead to administrative chaos")[76] is understandable, particularly in view of the broad scope of the embargoes at issue in the Second Circuit. This concern, however, is simply not applicable to tariff filings where the statutory mechanism includes procedural safeguards specifically designed to avoid "administrative chaos" and any risk to the "entire regulatory scheme."[77]

In addition, as the Board itself has recognized many times, embargoes and tariffs were never intended to be interchangeable mechanisms for accomplishing the same result. In its brief to the Second Circuit in *ALPA v. CAB* the Board stated, ". . . the tariff provisions of the Act and the implementing regulations provide a means by which carriers may specify those articles which they *will not* accept for shipment for whatever reason."[78] In its Second Circuit

---

70. 516 F.2d 1269 (2d Cir. 1975).

71. *Id.* at 1272.

72. *Id.* at 1273 (emphasis added and footnote omitted).

73. *Id.*

74. *Id.* at 1275 (footnote omitted).

75. 14 C.F.R. § 228.2 (1976).

76. 516 F.2d at 1276.

77. We also note that this quoted language appears in the context of the court's interpretation of section 1111(a)'s scope, and therefore should probably be restricted to that context. *See supra* at ―― of 177 U.S.App.D.C., 254–255 of 543 F.2d & n. 25.

78. Brief for Respondent in *ALPA v. CAB,* 516 F.2d 1269 (2d Cir. 1975), at 16 (emphasis in original). The CAB did, of course, qualify this observation with the following footnote:

Such tariffs are, of course, subject to Board scrutiny on its own initiative or in response to complaints by third parties, and such scrutiny may lead the Board to a determination that the tariffs should be rejected or otherwise disapproved. Any such Board determination would, of course, be subject to judicial review. Indeed, consolidated judicial review is currently being sought with respect to several Board orders insofar as such orders either: (a) reject, (b) purport to reserve a right to reject after effectiveness, or (c) direct carriers to conform tariffs to a pending rulemaking proceeding, when such hazardous ar-

brief the Board also noted that at the time it reissued Part 228 of its regulations,[79] entitled "Embargoes on Property", it explained that "a prolonged refusal to carry property, or particular types of property, is a matter necessitating a tariff filing rather than an embargo."[80] Similarly, these embargo regulations provide that they "shall not be construed as precluding any air carrier from filing an appropriate tariff where the carrier finds it necessary, on a long-term or permanent basis, to limit the scope of its holding out of authorized freight services,"[81] and that a "refusal to accept property for transportation in accordance with the restrictions and limitations in the tariff . . . of an air carrier" shall not be deemed an embargo.[82]

Thus, we find nothing in *United, Municipal Light Boards,* or *ALPA*—the principal cases relied upon by the Board—to cast doubt on our determination that petitioners are entitled to an investigation and hearing under section 1002. To our mind, both the Federal Aviation Act and the Board's regulations seem specifically to contemplate that carriers may desire to propose tariffs more stringent than FAA/DOT regulations. When such proposals are filed the CAB must decide whether they will be accepted or suspended pending an investigation and hearing; but rejection under section 403 is not an available alternative. The Second Circuit's determination in *ALPA,* that petitioners' embargo notices were an inappropriate procedural device, only reinforces our conclusion that tariff findings provide the proper and only procedural vehicle on which the air lines may pursue their carriage restriction objectives. Whether the carriers should attain these objectives is another question entirely, a question involving complex issues of economic cost, common carri-

er responsibility, and public interest, which we leave to the CAB in the first instance.

## V. AUTHORITY TO IMPOSE TARIFFS

Section 1002(d) is the only provision of the Federal Aviation Act authorizing the Board to "determine and prescribe" the lawful rules or regulations to be made effective in tariffs. This section provides, in relevant part, as follows:

> Whenever, *after notice and hearing,* upon complaint, or upon its own initiative, the Board shall be of the opinion that any . . . classification, rule, regulation, or practice . . . is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial, the Board shall determine and prescribe . . . the lawful classification, rule, regulation, or practice thereafter to be made effective.
> . . .[83]

Thus, the Board's authority to impose a tariff, *i. e.,* to prescribe rules and regulations, is conditioned on a finding of unlawfulness and a requirement that it act on the basis of "notice and hearing."

The power of the CAB to impose a tariff by means other than those provided in section 1002(d) has been strongly denied by this court. In 1969 the Board attempted to determine and prescribe rates by using its suspension, rather than rejection, authority. This court in *Moss v. CAB,*[84] held that, since the Board had not observed the notice and hearing requirements of section 1002(d), its resulting order was invalid and the tariffs filed pursuant to that order were unlawful. In *Moss* (which involved economic, not safety, issues) the Board issued an order that suspended and set down for investigation rates proposed by various air carriers and went on to set forth a ratemaking formula

ticles tariffs are not identical with Federal Aviation Administration rules. *Delta Air Lines v. C.A.B.,* C.A.D.C. No. 74–1984 *et al. Id.* at n. 14.

**79.** 14 C.F.R. Part 228 (1976).

**80.** Brief for Respondent in *ALPA v. CAB,* 516 F.2d 1269 (2d Cir. 1975), at 16–17; *see* 38 Fed.Reg. 4243 n. 10 (1973).

**81.** 14 C.F.R. § 228.7 (1976).

**82.** 14 C.F.R. § 228.1 (1976).

**83.** 49 U.S.C. § 1482(d) (1970) (emphasis added).

**84.** 139 U.S.App.D.C. 150, 430 F.2d 891 (1970).

which the Board proposed to accept. This court found, in Judge Wright's words, that

> [a]s a practical matter, the Board's order amounted to the prescription of rates because, as the Board admit[ted], the pressures on the carriers to file rates conforming exactly with the Board's formula were great, if not actually irresistable. All the carriers had indicated an urgent need for an immediate increase in revenues; the Board had made it clear, by threatening to use its power to suspend proposed rates, that only rates conforming to its detailed model would be accepted and not suspended.[85]

In response to the Board's contention that it had not "ordered" the rates at issue in *Moss,* this court stated,

> It would be blinking reality to hold . . . that the [Board's] order . . did no more than suspend and initiate an investigation of the rates proposed by the carriers . . .. The Board did all that it could, short of formally styling its order as rate-making, to induce the carriers to adopt the proposed rates. . . .
> Even a cursory reading of the order makes it clear that the Board told the carriers what rates to file. . . .[86]

■ Likewise, it would be blinking reality to hold that the orders here under review did nothing more than reject proposed tariffs which were formally defective or substantive nullities. Clearly, in its orders—especially in the two orders which tell carriers exactly what the Board "expects" them to do [87]—*the Board was attempting to determine and prescribe the rules and regulations applicable to hazardous cargo, without notice and hearing, i. e.,* the Board was telling the carriers exactly what rules and regulations to include in their tariffs. Under any realistic interpretation, these orders involved the legislative determination of rules and regulations affecting petitioners' rates and therefore the Board should have adhered to section 1002, the statutory provision explicitly designed for the prescription of such rates, rules, and regulations "after notice and hearing."

■ While the CAB may have the authority to require air carriers to transport all cargo which FAA/DOT defines as acceptably safe, it does not have the authority to mandate this result without a hearing and investigation. If the CAB will follow the procedures of section 1002, after hearing evidence on the issues raised by petitioners' tariffs, it may be able to determine and prescribe the lawful rules and regulations applicable to hazardous cargo.[88] It can not, however, accomplish this result by the shorthand method of rejecting every filing that is more restrictive than the FAA/DOT's current safety position and letting it be known that the Board will continue rejecting all such tariffs. This is the same improper short cut we disapproved in *Moss.*

## VI. THE EFFECTIVE TARIFFS

Until now, we have not attempted to distinguish between the two types of tariffs which the Board purported to reject in its five challenged orders: (1) the proposed tariffs which were still pending before the Board and (2) the effective tariffs as to which the question of rejection had been deferred while they became effective. Since, however, two of the tariffs at issue here fall into the latter category,[89] we must determine what power the Board had with respect to these tariffs. Logically, it would seem that after a tariff becomes effective the Board would have less power over it than it did before effectiveness, and, indeed, this is the case. Therefore, since we

---

85. *Id.* at 897 (footnote omitted).

86. *Id.* at 897–99 (footnote omitted).

87. Order 75–2–105, J.A. at 16 (26 Feb. 1975); Order 75–3–13, J.A. at 18 (6 Mar. 1976).

88. Of course, the Board will also have to find that the rules or regulations in question (suspended or effective) are "unjust," "unreasonable," "unjustly discriminatory," "unduly preferential," or "unduly prejudicial." 49 U.S.C. § 1482(d) (1970).

89. The Eastern-Frontier and the second Delta tariffs rejected in Order 75–4–75, J.A. at 20 (15 April 1975).

have already held that the Board's rejection of petitioners' *proposed* tariffs was unlawful, the Board's rejection of petitioners' already-effective tariffs becomes an a fortiori case of unlawful action.

As the Supreme Court reminded us in *CAB v. Delta Air Lines, Inc.,* ". . . the fact is that the Board is entirely a creature of Congress and the determinative question is not what the Board thinks it should do but what Congress has said it can do." [90] In that case the Board purported to "reserve" the power to act on a petition for reconsideration and thereby amend a certificate of public convenience and necessity after it became effective. The Supreme Court held that when a certificate vests, the Board may alter that certificate only by following the procedures prescribed by the Federal Aviation Act, *i. e.,* by providing the formal notice and hearing required by section 401(g) of the Act.[91] Obviously, the facts of *CAB v. Delta* are strikingly similar to those we confront today, and thus it provides strong support for our conclusion that once a tariff is permitted to become effective, the Act allows only an investigation and hearing pursuant to section 1002.[92]

Given the nature and purpose of the Board's rejection power under section 403, namely to prevent the filing of substantive nullities and tariffs suffering from technical or formal deficiencies, it is obvious why the Act does not permit rejection, as opposed to investigation, after a tariff becomes effective. As Judge Leventhal explained in *Municipal Light Boards,* rejection is a " 'peremptory form of response to filed tariffs' which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order." [93] We find implicit in Judge Leventhal's description a recognition that rejection is a regulatory device properly used only *prior* to a tariff's effective date.

Turning to the statute itself, the reference in section 1002(g) to what "would be proper" *after* a tariff "had become effective" makes it even more clear that an investigation is the only mechanism available to the Board for challenging *effective* tariffs. After empowering the Board, whenever an air carrier files a new tariff, to enter upon a hearing concerning the lawfulness of such tariff and, pending such hearing, to suspend the operation of such tariff, section 1002(g) provides, ". . . *after hearing,* whether completed before or after the rate, fare, charge, classification, rule, regulation, or practice goes into effect, the Board may make such order with reference thereto *as would be proper in a proceeding instituted after such rate, fare, charge, classification, rule, regulation, or practice had become effective,*" [94] *i. e.,* in an investigation proceeding under section 1002.[95] Thus, from the plain words of the statute and from the logic of *CAB v. Delta* and *Municipal Light Boards,* it is clear that once the Board has permitted a tariff to become effective, it may not reject or sus-

**90.** 367 U.S. 316, 322, 81 S.Ct. 1611, 1617, 6 L.Ed.2d 869 (1961).

**91.** 49 U.S.C. § 1371(g) (1970).

**92.** 49 U.S.C. § 1482(b), (c), & (d) (1970).

**93.** 450 F.2d at 1346 (footnote omitted).

**94.** 49 U.S.C. § 1482(g) (1970) (emphasis added).

**95.** Under the Federal Aviation Act only two types of "orders" are proper in a proceeding instituted *after* a tariff has become effective. First, section 1002(c) provides:

> If the Administrator or the Board finds, *after notice and hearing, in any investigation* instituted upon complaint or upon their own initiative, with respect to matters within their jurisdiction, that any person has failed to comply with any provision of this chapter or any requirement established pursuant thereto, the Administrator or the Board shall issue an appropriate order to compel such person to comply therewith.

49 U.S.C. § 1482(c) (1970) (emphasis added). Second, section 1002(d) empowers the Board to "determine and prescribe" lawful rules and regulations *after notice and hearing* and upon a finding that currently effective (or suspended) tariffs are unjust, unreasonable, etc. *See* section V of this opinion *supra.* Since both of these provisions require notice and hearing, as well as a finding of some form of unlawfulness, the Board orders at issue in this case comply with neither provision.

pend that tariff;[96] it may only investigate and take appropriate action after notice and hearing.

## VII.  CONCLUSION

In the absence of any of the deficiencies in tariff filings encompassed by section 403, the only remaining lawful procedure available to the Board to prevent a proposed tariff from going into effect is suspension pursuant to section 1002(g), a procedure which the Board declined to follow in the orders here under review.[97]  Our examination of the statutory framework and regulatory scheme designed by Congress, as well as the relevant caselaw, convinces us that the Federal Aviation Act contemplates that all tariffs filed in compliance with basic formal requirements and minimal substantive requirements will be accepted by the Board *for filing*.  Substantive concerns regarding the lawfulness of the rules or regulations in such a tariff (unless the tariff is, on its face, a substantive nullity) can only be resolved after a hearing, during which time the Board may suspend the tariff for up to 180 days.  It is not contemplated by the Act that the Board can, *on its own motion and without hearing*, reject a tariff filing just because the Board believes that the rules or regulations set forth in the tariff are improper.  This is a determination which can only be made at the hearing required by section 1002.

By choosing to reject, rather than suspend and investigate, petitioners' tariffs, the Board simply rubber stamped FAA/DOT's position on safety and avoided completely its own responsibilities in such areas as economics, common carrier responsibility, and public interest.  While the FAA/DOT safety regulations (on which the Board *exclusively* relied) will constitute part of the evidentiary record in the hearing and investigation we now order the Board[98] to conduct, much other important

---

**96.**  The Board itself recognizes that once a tariff goes into effect it may not be suspended.  *See* Order 76–2–65 at 1 (18 Feb. 1976) ("Inasmuch as United's refusal to accept poisonous snakes is already in effect, this provision is not subject to suspension."); *accord,* Order 74–6–77 at 2; Order 71–3–10 at 2; Order 72–9–90 at 2.

**97.**  Of course, as this court indicated in *Moss v. CAB,* 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), the Board also must not attempt to use its suspension power as a substitute for the prescribed procedures of section 1002(d).  If the Board elects to determine and prescribe the rules and regulations applicable to hazardous cargo, it can not escape through suspension or rejection the two requirements of section 1002(d): (1) notice and hearing and (2) a finding that the effective (or suspended) rule or regulation is unjust, unreasonable, etc.

**98.**  It has come to our attention through respondent CAB's petition for rehearing (filed 3 August 1976) that *only safety justifications,* and no economic justifications (such as those we list on page —— of 177 U.S.App.D.C., on page 259 of 543 F.2d *supra*), were advanced by the carriers when they filed the tariffs here at issue.  Even so, this does not eliminate the need for a hearing in this case or legitimize the CAB's rejection of petitioners' tariffs.  We say this for three reasons.

First, as the Board candidly concedes, its "rejection orders . . . rested on grounds other than the petitioners' failure to submit economic justification for their tariffs . . . and the case on review was briefed, argued, and decided on the . . . grounds . . ." given in those CAB rejection orders.  Petition of Respondent for Rehearing at 9.

Second, as we make clear in footnote 56 and the accompanying text *supra,* we do not preclude the possibility that the Board retains a small residue of jurisdiction over safety matters whereby it could approve these tariffs based on safety justifications alone.  Indeed, if, at the CAB hearing which follows this decision, petitioners persist in relying on safety considerations alone (or if the CAB's procedural rules restrict them to the justifications raised by their initial tariff filings), then the Board will have to decide the difficult jurisdictional question pointed to in footnote 56.

Finally, as we explain in section V *supra,* while the CAB may have the authority to require air carriers to transport all cargo which FAA/DOT defines as acceptably safe, it does not have the authority to accomplish this result by the shorthand method of rejection.  Section 1002(d), which requires notice and hearing, is the only provision of the Federal Aviation Act authorizing the Board to "determine and prescribe" which rules and regulations will become effective in tariffs.  Of course, if, at the hearing following this decision, the CAB decides that it retains no safety jurisdiction (again *see* note 56 *supra* ), then rejection of future tariff filings which do not precisely mirror FAA/DOT's safety regulations will be proper—*assuming that those filings rely on safety justifications alone* (and assuming that, if ap-

evidence relating to economic cost and common carrier responsibility will also be presented to and considered by the Board.

The Board's rejection of petitioners' tariffs would have precluded such consideration, and it is for this reason that the five orders challenged herein are unlawful. Accordingly, these orders are vacated and this case is remanded to the Civil Aeronautics Board for such action under the Federal Aviation Act as is consistent with this opinion.

*So ordered.*

pealed, the CAB's jurisdictional determination is upheld.) With all economic and common-carrier-responsibility considerations removed, the Board would no longer be required to proceed under section 1002(d) because its rejection orders would no longer involve the legislative determination of rules and regulations affecting the carriers' rates. With regard to safety, all such legislative determinations would be completely in the hands of FAA/DOT. If, on the other hand, economic or common-carrier-responsibility considerations are raised by future filings, the CAB would, as we have held, be powerless to act except through the procedures of section 1002, regardless of its safety jurisdiction. In any event, for the moment a CAB hearing is required to decide at least the common carrier responsibility/safety jurisdiction question raised by footnote 56, if for nothing else.