**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

and

**New York Air Lines, Inc., Intervenors.**

**Nos. 798, 818, Dockets 80–4252, 80–4262.**

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1981.

Decided March 9, 1981.

Gary Green, Washington, D. C. (James W. Tello, James Johnson, Washington, D. C., of counsel), for petitioner.

John O'B. Clarke, Jr., Washington, D. C. (Highsaw & Mahoney, P. C., Washington, D. C., of counsel), for petitioner Intern. Ass'n of Machinists and Aerospace Workers.

Michael Schopf, Deputy Gen. Counsel, Washington, D. C. (Mary McInnis, Gen. Counsel, Glen M. Bendixsen, Asso. Gen. Counsel, J. Thomas Ezell, Mark Frisbie, Attys., CAB, Washington, D. C., Sanford Litvack, Asst. Atty. Gen., Robert R. Nicholson, Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., of counsel), for respondent.

Gerry Levenberg, Washington, D. C. (Van Ness, Feldman & Sutcliffe, Peter D. Dickson, Washington, D. C., of counsel), for intervenor New York Airlines, Inc.

Roland P. Wilder, Jr., Washington, D. C. (Robert M. Baptiste, David J. Gzesh, Washington, D. C., of counsel), for intervenor Intern. Broth. of Teamsters.

Before MOORE, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

New York Air Lines, Inc. (NYA) is a newly formed air carrier and subsidiary of Texas Air Corp. (TAC) which also controls Texas International Airlines, Inc. (TXI), an established and certificated air carrier which operates predominantly in the southeast. On September 8, 1980, NYA, TXI and TAC applied to the Civil Aeronautics Board for a certificate of public convenience and necessity for NYA to conduct new passenger-carrying air service between New York City and Washington, D. C., 49 U.S.C. § 1371, and for approval of their interlocking relationships and common control, 49 U.S.C. §§ 1378, 1379. In order that service on the New York City-Washington, D. C. route might be commenced on December 14, 1980, the applicants moved for expedited procedures. On September 30, 1980, in Orders No. 80–9–176 and 80–9–177, the Board tentatively concluded that NYA's requested route authority was "consistent with the public necessity and convenience," directed the interested parties to show cause why final approval should not be granted and instituted a fitness investigation of NYA to be set for a hearing before an Administrative Law Judge. The issues to be considered at the fitness hearing included whether NYA was fit, willing and able to perform the services sought and whether the common control and interlocking relationships would adversely affect the public interest. (Order No. 80–9–176).

The Air Line Pilots Association, International (ALPA), Association of Flight Attendants, International Brotherhood of Teamsters, Airline Division (Teamsters), International Association of Machinists and Aerospace Workers (IAM), Pacific Southwest Airlines, Piedmont Aviation, Inc., and U. S. Air, Inc., sought leave to intervene in the fitness investigation and leave was granted on October 23, 1980. (Order 80–10–131). The labor intervenors attempted to show that NYA was not fit, willing and able as required by Section 401(d)(1) of the Federal Aviation Act, 49 U.S.C. § 1371(d)(1), and, therefore, CAB should not issue a certificate of public convenience and necessity. Specifically, the unions, especially ALPA, offered evidence which would show that TXI management had attempted to increase the payload of its DC–9 aircraft by instituting an optimum take-off speed resulting in numerous blown tires; further attempts by TXI to increase payload by mounting a rocket on the aircraft resulting in weight and balance errors; the existence of eight different cockpit layouts in TXI DC–9s which were to be leased to NYA resulting in safety hazards due to frequent moves by pilots among the various layouts; NYA's proposed rules on minimum rest time and maximum flight and duty time were less protective against pilot fatigue than TXI's and the FAA minimum requirements in this area are obsolete; and if TAC had not created a new air carrier with

newly recruited captains, TXI's experienced captains would have flown the new route resulting in increased safety. Finally, ALPA sought to introduce evidence regarding the inferiority of proposed wages and working conditions at NYA.

ALPA contended that Section 3 of the Airline Deregulation Act of 1978, P.L. 95–504, 92 Stat. 1705, codified at 49 U.S.C. § 1302, requires the CAB to "fully evaluate" the report of the Federal Aviation Administration on the safety implications of new air carriers, 49 U.S.C. § 1302(a)(1), and to recognize the clear intent of Congress in the "furtherance of the highest degree of safety in air transportation and air commerce." *Id.* at § 1302(a)(2). Thus, the argument continues, the CAB is now required to scrutinize more carefully the safety consequences in each new entrant's proposal. Similarly, in 49 U.S.C. § 1302(a)(3), the Board is directed to consider as being in accordance with the public interest the "need to encourage fair wages and equitable working conditions." Thus, argue the unions, the Board was required to consider the labor implications of NYA's proposal as part of the fitness investigation.

The Administrative Law Judge precluded ALPA from offering the above described proof. He did, however, permit the Bureau of Domestic Aviation to introduce into evidence a letter from R. L. Collie, Chief, Air Transportation Division Office of Flight Operations at the FAA to Peter M. Block at the CAB. The letter is a "response" to a CAB request for a safety and compliance evaluation of NYA and TXI. In this one page letter, Mr. Collie wrote that NYA was not yet certificated by the FAA and therefore, no information about that carrier was available. In fact, the FAA did not certificate NYA until December 19, 1980, eight days after the CAB issued the order presently under review. Service on the New York-Washington, D. C. route commenced on that same date. Regarding TXI, Mr.

Collie wrote that "[i]n our opinion, [TXI] is conducting its operations satisfactorily in accordance with [FAA Regulations]." He further wrote that "[w]e know of no reason why the Board should act unfavorably on the New York Air Lines application." ALPA sought to subpoena Mr. Collie to appear at the hearing. The FAA, however, sent another official, Mr. J. Johnson, who was not familiar with the Collie letter. Mr. Johnson confirmed that the FAA had not yet even made internal staff recommendations on NYA's FAA certificate qualifications.

On November 26, 1980, pursuant to a CAB order, the record was closed and immediately certified to the Board without recommendation by the ALJ. Briefs were to be filed by December 3, 1980 and oral argument was held before the Board on December 4. Thereafter, on December 11, the Board issued the order appealed from in this case.

### I.

In the December 11 order, Order No. 80–12–57, the CAB made final its tentative conclusion that certification of NYA would be consistent with the public convenience and necessity. Only one objection to certification had been filed in the show cause proceedings by Air New York which the Board rejected.[1] With regard to the fitness investigation, in which the labor parties intervened, *supra*, the Board found that NYA was fit, willing and able to provide the proposed service. *Id.* at 4. The Board determined that NYA had met the three criteria uniformly applied to determine fitness:

[a]n applicant can qualify for a certificate if it can demonstrate that it: (1) will have the necessary managerial skills and technical ability, before beginning service, to operate safely; (2) if not internally financed, has a plan for financing that, if carried out, will generate resources suf-

---

1. Air New York argued that the similarity in names between it and NYA would cause public confusion and, therefore, certification would not be consistent with the public convenience and necessity. Because Air New York is not

presently operating, lacks FAA operating authority and its CAB certification has been canceled, the Board dismissed this claim of possible confusion as meritless. No appeal is taken from this part of the Board's order.

ficient to commence the operations proposed without undue risk to consumers; and (3) will comply with the Act and regulations imposed by Federal and state regulatory agencies. We find that NYA meets all three criteria and should be found fit.

*Id.* (footnote omitted).

Moreover, the Board held that the amendments to Section 102 of the Federal Aviation Act embodied in the Airline Deregulation Act of 1978, *supra*, did not impose any further duties upon the Board with respect to safety or labor considerations. Concerning the labor implications, the Board noted that pursuant to Section 401(k)(4) of the Act, 49 U.S.C. § 1371(k)(4), the CAB has always been required to ensure that carriers comply with Title II of the Railway Labor Act. Thus, the Board reasoned, "the language on wages and working conditions in section 102(a)(3) does not mandate the Board to expand its presence in the industry's labor field." *Id.* at 17. With respect to the ALPA's argument that CAB must now evaluate a new carrier's propensity for safety, the Board held that:

> [t]he Federal Aviation Administration sets standards for both pilots and carriers. Unless those standards are met, they simply cannot obtain FAA certification. Although the concern of aviation safety is one for both agencies, for us to try to judge such questions as pilot competence would represent a departure from our primary area of expertise and an intrusion into the FAA's primary sphere. We are unwilling to make such inroads, and will abide by the FAA's determination of whether the applicant and its pilots are worthy of FAA certification.

*Id.* at 20.

Thus, relying to a large part upon the Collie letter, *supra*, the Board found that there were no technical safety problems associated with NYA's entry into the New York City-Washington, D. C. route competition. Any other approach, according to the Board, which involved a CAB investigation into NYA's safety "would be impractical, and inconsistent with the clear Congressional scheme of establishing the FAA as the federal agency primarily responsible for airline safety and the CAB as the agency chiefly responsible for the economic regulation of air transportation." *Id.* at 21. The Board, therefore, affirmed the rulings by the ALJ and issued its order certificating NYA.[2] The ALPA, IAM and Teamsters now seek review of that order in this court.

## II.

The CAB is charged with the responsibility of determining whether NYA was fit, willing and able to conduct the air transportation service proposed. 49 U.S.C. § 1371(d)(1). In determining fitness the CAB has consistently taken the view that technical operating matters are within the province of the FAA and that its own inquiry was primarily to determine whether the carrier had the financial resources and management experience to enable it to operate with economic safety.[3] When Congress enacted the Federal Aviation Act of 1958 (49 U.S.C. § 1301 et seq.), it "established a bifurcated regulatory scheme entrusting two distinct agencies with different responsibilities in this area: FAA/DOT bears the primary responsibility for safety regulation while the CAB administers and enforces the economic provisions of the Act." *Delta Airlines, Inc. v. CAB*, 543 F.2d 247, 259 (D.C.Cir.1976). In support of the order below CAB argues on appeal that the Board had found that NYA had a management team of impressive qualifications and extensive management experience. In ad-

---

2. Although IAM raised objections to the common control and interlocking directorates in the proceedings below, these arguments have not been advanced in this court. Thus, the Board's approval of the TAC control of NYA, pursuant to Sections 408 and 409 of the Act, 49 U.S.C. §§ 1378, 1379, will not be reviewed herein.

3. *See, e. g., Transcontinental Low-Fare Route Proceeding,* Order 79–1–75 (January 11, 1975); *Transatlantic Route, Supplemental Renewal Cases,* 72 C.A.B. 216 (1976). *See also, Western Air Lines, Inc. v. CAB,* 495 F.2d 145, 154–55 (D.C.Cir.1974).

dition, the Board found that NYA had an unusually strong financing base with a reasonable profit forecast. It further found that, in view of its financial resources, NYA could absorb losses without endangering the safety of its operations. The CAB found also that NYA and its management personnel were likely to comply with the Federal Aviation Act and the regulations.

If the safety factor in the fitness requirement is as circumscribed as the CAB maintains then there is no difficulty in upholding the order which we have been asked to review. The petitioners, however, argue here as they did to the Board that whatever the CAB's position may have been in the past, the Airline Deregulation Act of 1978 indicates a Congressional recognition that free market entry must be accompanied by more stringent government scrutiny of the applicant's fitness and safety. They rely primarily on Sections 102(a)(1), (2) and (3) which are set forth in the margin.[4] Petitioners claim that these provisions create new public interest factors which require the CAB to enter the thicket of both safety and labor regulation so that all probative evidence bearing upon NYA's safety-fitness and labor practices be considered by CAB. We consider these issues separately.

(a) *Safety*

■ We do not read the statute to impose upon CAB the technical safety issues traditionally the responsibility of FAA. The language of Sections 102(a)(1) and (2)

does not on its face mandate any such initial inquiry. Congress did not modify in any way the substance of the fitness requirement and in Section 419(c)(3), 49 U.S.C. § 1389(c)(3), it directed FAA to establish safety regulations for small community service commuter aircraft. We find nothing in the legislative history of the Deregulation Act to support petitioners' view. It would be in our judgment unreasonable to suppose that the Congress, which in Section 40(a) of the Deregulation Act, 49 U.S.C. § 1551, determined that the CAB be completely phased out as an agency by January 1, 1985, was at the same time vesting it with jurisdiction it had consistently eschewed. In view of the Congressional concern with expedited procedures and time limits for certification to ease market entry, it would be self defeating to have a duplicative technical safety investigation by an agency which has maintained that it does not have the personnel or expertise in the area. The evidence as to safety factors sought to be introduced below and noted above were properly characterized as technical and thus properly excluded by the Board.

■ At the same time we agree with the petitioners that the CAB is obliged by the specific language of Section 102(a)(1) to make "prior to the authorization of new air transportation services, full evaluation of the recommendations of the Secretary of Transportation on the safety implications of

4. Sections 102(a)(1), (2) and (3), 49 U.S.C. §§ 1302(a)(1), (2) & (3), provide:

(a) In the exercise and performance of its *powers and duties under this chapter with re*spect to interstate and overseas air transportation, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(1) The assignment and maintenance of safety as the highest priority in air commerce, and prior to the authorization of new air transportation services, full evaluation of the recommendations of the Secretary of Transportation on the safety implications of such new services and full evaluation of any report or recommendation submitted under section 1307 of this title.

(2) The prevention of any deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of the Congress to the furtherance of the highest degree of safety in air transportation and air commerce, and the maintenance of the safety vigilance that has evolved within air transportation and air commerce and has come to be expected by the traveling and shipping public.

(3) The availability of a variety of adequate, economic, efficient and low-price services by air carriers without unjust discriminations, undue preferences or advantages, or unfair or deceptive practices, the need to improve relations among, and coordinate *transportation by air carriers, and the need* to encourage fair wages and equitable working conditions.

such new services and full evaluation of any report or recommendation submitted under Section 1307 of this title." 49 U.S.C. § 1302(a)(1). While CAB claims that it has complied by reviewing the one page Collie letter to which reference has been made, as we have noted, this letter simply indicated that the FAA had no information available [on NYA] and "[w]e know of no reason why the Board should act unfavorably on the New York Air Lines application." No reference was made to any specific FAA safety regulations, no details are provided and CAB could not and did not make the full evaluation required by Section 102(a)(1).

Nevertheless, on December 18, 1980 the FAA did certify NYA to operate its New York to Washington, D. C. operation. While the petitioners did not participate in that proceeding, 49 U.S.C. § 1486 provides for a judicial review by the court of appeals wherein the petitioner resides or has his principal place of business or in the United States Court of Appeals for the District of Columbia. The petition must be filed within 60 days after the date of entry of the order by any person disclosing a substantial interest in such order. *Id.* After the expiration of sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore. The record does not reveal whether the petitioners here have taken this step. Their petition here is from the CAB order and not the FAA certification. We believe a direct review of the FAA order presents a preferable procedural posture than a remand by this court to the CAB. As indicated in *Delta Air Lines, Inc. v. CAB, supra,* 543 F.2d at 260 ". . . in general we believe that the Board should defer to the safety expertise of its sister agencies and accept the FAA/DOT position on safety as establishing both an inner and an outer limit on its safety jurisdiction." See also *Air Line Pilots Assoc., International v. CAB,* 494 F.2d 1118, 1127 (D.C.Cir. 1974). It is quite evident that the CAB would normally accept the FAA's certification. The litigation here properly involves the petitioners and the FAA; the interposition of the CAB will add little if anything to the disposition of whatever merits there may be in the petitioners' safety concerns.

### (b) *Labor*

█ The petitioners have also contended that under Section 102(a)(3) of the Deregulation Act, 49 U.S.C. § 1302(a)(3), the CAB is required to take into consideration as a general factor bearing upon public interest "the need to encourage fair wages and equitable working conditions." Again the CAB has taken the position that this broad language should not be construed to constitute that agency a general labor board for the airline industry. In view of the impending demise of the CAB we are not inclined to read this language as broadly as the petitioners would suggest. Even before deregulation, this court has held that there is a public interest in maintaining a degree of stability in air transportation that freedom from industrial strife will provide. We have thus upheld a CAB order prescribing a seniority list in a merger case where a dispute arose among two or more employee groups. *Kent v. CAB,* 204 F.2d 263 (2d Cir.), cert. denied, 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953). However, no merger or acquisition is involved here. Jobs are being created and not eliminated. We find no precedent or warrant in the broad language relied upon to require the CAB to become a labor arbiter where a new entrant is being certified and no general labor unrest involving the public interest can be reasonably anticipated.

Section 102(a) refers to public interest factors but the labor petitioners did not intervene in the show cause proceeding on the public convenience and necessity order. The thrust of their argument is that labor considerations have an impact on safety standards but there is nothing in the Act to indicate that the Congress considered this to be a basis for Board intervention. The ALPA has brought an action in the District Court for the Eastern District of New York against TXI, NYA and TAC urging that pilots flying the proposed NYA flights are within the collective bargaining agreement between ALPA and TXI. By order dated

December 1, 1980 Judge Nickerson remitted the dispute to the National Mediation Board. *Air Line Pilots Assoc., International v. Texas International Airlines, Inc.*, 502 F.Supp. 423 (1980). ALPA has filed an appeal in this court. It appears therefore that ALPA's concern for affected employees is before other fora and is not properly litigated on the appeal from the fitness order.

The concern of the labor petitioners for fair and equitable working conditions is already provided for by Section 401(k)(4), 49 U.S.C. § 1371(k)(4), which makes it a condition of certification that a carrier comply with Title II of the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq. As the Board noted, the RLA permits the employees of a carrier to select a bargaining representative and compel bargaining as to salary and working conditions. The RLA created the National Mediation Board as the exclusive agency to determine representation disputes and provides for arbitration of disputes arising under existing contracts. In view of these explicit provisions we cannot interpret the broad language of Section 102(a)(3) to provide a duplicative labor function for the CAB. The concerns of the unions here can be and should be raised before that agency.

The petition for review is denied.

MANSFIELD, Circuit Judge (concurring):

I concur in the affirmance of the Civil Aeronautics Board order, substantially for the reasons stated by Judge Mulligan in his carefully considered opinion. However, I believe that a few words of caution to the CAB are in order, lest our affirmance be misconstrued as a carte blanche approval for future purposes of the procedure followed by it in this case. The CAB must recognize that while the Deregulation Act of 1978 does not require it to go as far as the labor parties contend in evaluating recommendations regarding the safety implications of new services or the need to encourage fair wages and working conditions, it does impose some additional duties upon the Board, which must be performed.

First, as the majority recognizes, in this case the CAB "could not and did not make the full evaluation required by Section 102(a)(1)" since it issued its own certificate *before* the FAA had acted in any meaningful way. In this respect the Board clearly erred. The proper procedure was for the CAB, before issuing its certificate, to wait until the FAA's decision and recommendations had been issued so that they might first be considered in order to insure compliance with the CAB's duty to make the "full evaluation of the recommendations of the Secretary of Transportation on the safety implications of such new services" as expressly required by the statute in the interest of assuring "[t]he assignment and maintenance of safety as the highest priority in air commerce."

The majority excuses this lapse because on December 18, 1980, the FAA did certify NYA to conduct its New York to Washington, D. C., operation. I agree that absent proof that the FAA acted arbitrarily, applied the wrong standards, or made safety findings unsupported by substantial evidence, no useful purpose would now be served by reversing the CAB's decision, which would have the effect of suspending NYA's ongoing operations, since a reconsideration by the CAB would certainly result in its approval and formalistic reissuance of a fitness certificate. Our decision, however, should not be construed as authorizing such premature action by the CAB. Now that it and applicant carriers are on notice as to the proper procedure to be followed, the Board may anticipate that repetition would be met with a reversal.

Second, I believe it important to make clear that the reference in § 102(a)(3) to "the need to encourage fair wages and equitable working conditions" does impose affirmative duties on the CAB beyond insuring probable carrier compliance with Title II of the Railway Labor Act. The CAB is not required by § 102(a)(3) to investigate the details of wages, insurance and fringe benefits to be offered by the new carrier or to determine whether these amounts are

equal to or greater than those paid by existing carriers engaged in similar schedules or carriage. Nor must it become a labor expert or provide duplicative arbitration or mediation services. However, the CAB is expected under § 102(a)(3) to look at the carrier's proposed wages and working conditions generally in order to satisfy itself that the carrier will not, because of lack of financial resources, drastically reduce pay scales or benefits or alter working conditions to the point where the benefit to be derived from the new service will be outweighted by the injury to employee interests. Because the CAB appears to have complied *sub silentio* with this requirement in the present case, I am willing to concur. In the future, however, the Board should include specific findings with respect to this balancing of employee and service interests in its certification decisions.