**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

Fleming International Airways, Inc., Intervenor.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Federal Express Corporation, Intervenor.**

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Pacific Alaska Airlines, Inc., Intervenor.**

**Nos. 80–1168, 80–1327 and 80–1676.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 25, 1981.

Decided Oct. 30, 1981.

James W. Tello, Washington, D. C., for petitioner. Gary Green, Washington, D. C., entered an appearance for petitioner.

Mark Frisbie, Atty., C. A. B., Washington, D. C., with whom Michael Schopf, Deputy Gen. Counsel, and Alan R. Demby, Acting Associate Gen. Counsel, C. A. B., and Barry Grossman and Frederic Freilicher, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondent. J. Thomas Ezell, Atty., C. A. B., Washington, D. C., entered an appearance for respondent.

Allan W. Markham, Washington, D. C., entered an appearance for intervenor Fleming Intern. Airways.

Nathaniel P. Breed, Jr., Washington, D. C., was on brief for intervenor Federal Express Corp.

Alan F. Wohlstetter and Edward A. Ryan, Washington, D. C., entered appearances for intervenor Pacific Alaska Airlines, Inc.

Before WRIGHT, MacKINNON and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

WRIGHT, Circuit Judge:

The central issue in these consolidated cases is whether the Airline Deregulation Act of 1978, which provides for phased restoration of market competition in the airline industry, also raises the minimum safety standards for new carrier applicants and creates an expanded role for the Civil Aeronautics Board (CAB). Petitioner Air Line Pilots Association, International (ALPA) relies on language in the declaration of policy, 49 U.S.C. § 1302(a) (Supp. III 1979), to support its contention that the Act requires "more stringent government scrutiny of the applicants' fitness and safety" during the period of transition to free market entry.[1] Respondent CAB asserts that the Act did not modify either the standards for safety and fitness or the responsibilities of the agency. We hold that the 1978 Act left the CAB's safety mandate unchanged.

In the orders under review the CAB granted new operating authority to three existing carriers, relying on evaluations of the applicants' safety records by the Federal Aviation Administration (FAA). Federal Express Corporation, intervenor in No. 80–1327, was authorized to operate scheduled passenger service from Chicago-Midway to six other markets.[2] Fleming International Airways, Inc., intervenor in No. 80–1168, and Pacific Alaska Airlines, Inc., intervenor in No. 80–1676, received certificates to operate all-cargo service. In each case ALPA contends that the CAB should have denied certification because the carriers did not satisfy the new, higher, standard of safety established by the 1978 legislation. Alternatively, ALPA argues that the CAB's proceedings were procedurally flawed.

We conclude that, on the record as a whole, the CAB's decisions to grant operating authority to these three carriers were supported by substantial evidence and were not arbitrary, capricious, an abuse of discretion, or contrary to law. With respect to the qualifications of the applicants, we affirm, generally for the reasons stated in the opinions of the Board.[3] We also find no reversible procedural error in the CAB's proceedings. We wish, however, to set forth our position more fully on the issue of statutory interpretation. We agree with the Second Circuit, which has recently decided a substantially similar issue,[4] that ALPA's interpretation of the Airline Deregulation Act of 1978 is erroneous.

## I. BACKGROUND

The Federal Aviation Act of 1958 established a bifurcated regulatory scheme for the air transportation industry. Congress entrusted "safety regulation of civil aeronautics" to the FAA,[5] and gave the CAB authority over "air carrier economic regula-

---

1. Petitioner's brief at 21.

2. Federal Express has not implemented this grant of passenger service authority. In its brief the carrier states that it has no plans to do so. Intervenor Federal Express' brief at 10. If pending CAB regulations are promulgated, the CAB's fitness finding—made on January 24, 1980—will lapse after two years' delay in initiating service. See 45 Fed.Reg. 73085 (1980) (notice of proposed rulemaking).

3. In No. 80–1327 (Federal Express) the Board's Final Order, Joint Appendix (JA) 156–157, relied on findings in an order in a related proceeding, JA 121, 128–139, which reversed the adverse determination of the Administrative Law Judge (ALJ). In No. 80–1168 (Fleming International Airways) the Board declined petitioner ALPA's petition for discretionary review, JA 231–233, making the ALJ's Initial Decision, JA 210–222, effective as the Final Order of the Board. In No. 80–1676 (Pacific Alaska Airlines) the Board granted discretionary review, JA 392–397, of the Initial Decision, JA 377–389, remanded the case to the ALJ for further fact-finding on one issue, and subsequently granted the certificate, JA 442–448.

4. *Air Line Pilots Ass'n, Internat'l v. CAB*, 643 F.2d 935 (2d Cir. 1981).

5. 49 U.S.C. §§ 1421–1432 (1976) (Subchapter VI). The FAA is now within the Department of Transportation. 49 U.S.C. § 1652(e) (1976).

tion."[6] An applicant was required to obtain operating authority from the FAA, which conducted a technical investigation to determine compliance with FAA-promulgated safety regulations.[7] Before a new carrier could enter into service it also had to obtain a CAB certificate, based on a finding that the carrier was "fit, willing, and able" to provide the proposed service and to comply with the statute and CAB regulations, and that its proposed operations were "required by the public convenience and necessity * * *."[8] The CAB's decision focused on routes, prices, and conditions of service. It also analyzed economic factors that might affect the safety of operations, including the applicant's financial resources, management experience, operating plans, and compliance disposition. Lacking technical personnel of its own, however, the CAB relied on FAA determinations with respect to technical operating questions, including safety.[9]

Airline deregulation legislation passed in 1977 and 1978 instituted a phased program to restore a substantial measure of free market competition in air transportation.[10] Air cargo carriers are no longer subject to CAB regulation of routes and rates; the Board is required to certify all-cargo applicants "unless it finds that the applicant is not fit, willing, and able to provide such service" and to comply with CAB rules and regulations.[11] In passenger transportation the CAB will gradually be divested of regulatory authority. Until the end of 1981 it has the duty to grant certification to new domestic carriers which are "fit, willing, and able" to operate and to comply with regulatory requirements, and whose proposed routes are not inconsistent with the public convenience and necessity.[12] From 1982 to 1984 the CAB will determine only whether applicants are "fit, willing, and able."[13] On January 1, 1985 the CAB will be abolished.[14] Thereafter FAA safety certification will be sufficient to permit initiation of service. The statutory provisions at issue in these cases will therefore apply only to new carrier certification decisions by the CAB during the transition period, which ends at the beginning of 1985.

## II. THE CAB'S DUTIES UNDER THE AIRLINE DEREGULATION ACT

The CAB maintains that the 1978 Act did not change the substantive fitness standards required of new applicants.[15] It notes that the standard for certification, "fit, willing, and able," was unchanged by the 1978 legislation,[16] and that Congress did

---

6. 49 U.S.C. §§ 1371–1387 (1976) (Subchapter IV).

7. 49 U.S.C. § 1424 (1976) (air carrier operating certificates); *id.* § 1421 (safety standards, rules, and regulations).

8. *Id.* § 1371(d)(1).

9. *Air Line Pilots Ass'n Internat'l v. CAB, supra* note 4, 643 F.2d at 939–940; S.Rep.No. 631, 95th Cong., 2d Sess. 53 (1978); respondent's brief at 26–28, 34.

   In various contexts before 1978 this court expressly approved CAB reliance on FAA safety determinations. *See Delta Air Lines, Inc. v. CAB,* 543 F.2d 247, 260 (D.C.Cir.1976) ("it is clear to us that the Board fulfills its responsibilities with respect to safety questions when it determines that all FAA/DOT safety requirements have been satisfied"); *Air Line Pilots Ass'n, Internat'l v. CAB,* 494 F.2d 1118, 1127 (D.C.Cir.1974) ("The Federal Aviation Act of 1958 relieved the Board of primary responsibility for safety regulation, placing that responsibility instead upon the FAA * * *.").

10. Pub.L. No. 95–163, 91 Stat. 1284 (1977) (cargo reform legislation); Pub.L. No. 95–504, 92 Stat. 1705 (1978) (Airline Deregulation Act of 1978).

11. 49 U.S.C. § 1388(b)(1)(B) (Supp. III 1979).

12. *Id.* §§ 1371(d)(1), 1371(d)(9)(B)–(C).

13. *Id.* § 1551(a)(1)(A).

14. *Id.* § 1551(a)(4).

15. This construction of the new carrier certification provisions of the 1978 statute by the CAB, the agency charged with its administration, is entitled to substantial deference from the courts. *See Frontier Airlines, Inc. v. CAB,* 621 F.2d 369, 372 (10th Cir. 1980); *City of New Haven v. CAB,* 618 F.2d 955, 968 (2d Cir. 1980).

16. *Compare* 49 U.S.C. § 1371(d)(1) (1976) (pre-1978) *with* 49 U.S.C. § 1371(d)(1) (Supp. III 1979) (post-1978 general provision) *and id.* § 1388(b)(1)(B) (post-1977 all-cargo carrier provision).

not express any disapproval of the CAB's criteria for pre-1978 certification decisions. Therefore, the Board continues to focus on financial strength, managerial experience, operating plans, and "compliance disposition," economic factors which have a bearing on safety. In the CAB's view, the FAA retains primary responsibility for evaluating the technical ability of a carrier to operate safely and for assessing its past operating record.[17] The CAB receives information and opinions from the FAA on these issues. It "inquire[s] further if past operations create doubt as to [the applicant's] willingness to comply with aviation regulations,"[18] but it does not reexamine the FAA's technical determinations.

ALPA, in contrast, asserts that the 1978 legislation requires the CAB to apply a newly-tightened substantive safety standard to applicants for new carrier certification. ALPA maintains that the CAB may not certify a new carrier as "fit" to operate—even if it has passed muster with the FAA—unless the CAB is satisfied that the applicant will operate at the "prevailing level of safety in the airline industry"[19] in 1978. All parties agree that this standard is higher than FAA minimum safety requirements.[20]

ALPA's contention rests on language in the declaration of policy of the 1978 Act, 49 U.S.C. § 1302(a) (Supp. III 1979).[21] Section 1302(a) sets forth ten considerations which the CAB is directed to consider "as being in the public interest, and in accordance with the public convenience and necessity[.]" The first two of these factors are:

(1) The assignment and maintenance of safety as the highest priority in air commerce, and prior to the authorization of new air transportation services, full evaluation of the recommendations of the Secretary of Transportation on the safety implications of such new services and full evaluation of any report or recommendation submitted under section 1307 of this title.

(2) The prevention of any deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of the Congress to the furtherance of the highest degree of safety in air transportation and air commerce, and the maintenance of the safety vigilance that has evolved within air transportation and air commerce and has come to be expected by the traveling and shipping public.[22]

ALPA argues that these two provisions "placed squarely in the CAB a forum for review of the safety of proposed new services."[23] Congress recognized that most airlines now in operation have self-imposed safety procedures much more demanding than those required by law.[24] By logical deduction, if new entrants met only the FAA minimum requirements, the average level of safety in the airline industry would decline. Therefore, ALPA reasons, when Congress required the CAB to assure no deterioration in the prevailing level of safety, it mandated more than CAB reliance on FAA licensing decisions. In ALPA's view,

17. See JA 135–136, 212, 218, 232, 378 n.2, 381.

18. 45 Fed.Reg. 42593, 42594–42595 (1980) (establishing data reporting requirements for fitness determinations). Occasionally, even if the FAA has issued an operating certificate, the CAB may have independent safety concerns based on the applicant's economic condition or past behavior. If the CAB finds that an FAA-certified applicant is unlikely to obey applicable regulations in the future, it denies certification. See respondent's brief at 33 n.21.

19. Petitioner's brief at 21.

20. See id. at 22; respondent's brief at 32.

21. Section 102(a) was described as the "declaration of policy" in the House Report, H.R. Rep.No. 1211, 95th Cong., 2d Sess. 5–6 (1978), U.S.Code Cong. & Admin.News 1978, p. 3737, the Senate Report, S.Rep.No. 631, supra note 9, at 51, 181, and the Conference Report, H.R. Rep.No. 1779, 95th Cong., 2d Sess. 55–56 (1978), U.S.Code Cong. & Admin.News 1978, p. 3737.

22. 49 U.S.C. § 1302(a)(1)–(2) (Supp. III 1979).

23. Petitioner's brief at 22.

24. See Airline Deregulation and Aviation Safety, H.R.Rep.No. 930, 95th Cong., 2d Sess. (1978), discussed in text at notes 32 to 36 infra.

Congress imposed a new requirement: CAB adjudicatory proceedings must consider whether each applicant will be as safe as the industry-wide average.[25]

We decline to adopt this construction of the statute. The overall scheme of aviation deregulation and the legislative history of Section 1302 do not support ALPA's contentions. The 1978 Act does not require independent technical assessments of safety by the CAB, nor does it establish a more stringent safety standard for new carrier applicants during the transition period.

### A. The Statutory Scheme

Interpretation of safety requirements under the Airline Deregulation Act should be guided by the overall statutory framework. As the CAB emphasizes, it lacks the resources and expertise to judge whether a new carrier applicant satisfies given safety standards.[26] It has historically relied on the determinations of the FAA, which investigates new carriers and monitors existing carriers. The 1978 Act does not give the CAB additional appropriations or personnel to develop its own technical capacity to evaluate carrier safety.[27]

Moreover, the 1978 Act contemplates abolition of the CAB at the beginning of 1985.[28] After that date, if a carrier satisfies the FAA's safety standards and receives FAA certification, it will be permitted to provide air transportation. Recognizing this statutory schedule, ALPA nevertheless contends that an applicant between 1978 and 1984 must meet a higher standard of safety than before 1978 or after 1984 because Congress adopted special transitional measures. Without explicit legislative intent, this

court would not adopt such an implausible interpretation of the 1978 Act. The language and legislative history of the 1978 Act do not indicate such an intent on the part of Congress.

### B. Legislative History

ALPA derives support for tightened CAB safety standards primarily from Section 1302(a)(2) of the 1978 Act. This subsection of the declaration of policy expresses the goal of "prevention of any deterioration in established safety procedures" and states that Congress is dedicated to the "highest degree of safety" and to "maintenance of [existing levels of] safety vigilance * * *."[29] The legislative history and statutory background indicate, however, that each of these concerns was addressed in the first instance to the FAA, not to the CAB, the agency whose orders are under review in this case. Congress did not intend to make significant changes in the existing allocation of responsibility between the technically expert FAA and the economically oriented CAB.

First, the congressional exhortation to maintain "established safety procedures" appears to be an admonition to the FAA, the agency responsible for issuing operating certificates and regulating maintenance and inspection of equipment.[30] This language is derived from the House bill. In the House report[31] the Committee on Public Works and Transportation incorporated the findings and recommendations of an earlier report by the FAA's oversight committee, the House Committee on Government Opera-

---

**25.** Petitioner's brief at 21–24.

**26.** Respondent's brief at 26, 33–34; *see* sources cited in note 9 *supra*.

**27.** Respondent's brief at 34. Moreover, ALPA's proposed standard—the "prevailing level of safety in 1978"—is inherently imprecise and difficult to apply, even by an agency with the relevant expertise. Standards of safety, manifested in a myriad of operating, maintenance, and inspection procedures and in a multitude of regulations, cannot be readily quantified or directly compared. This is especially

true of predictions of future safety levels, which depend on intangibles including management attitudes as well as on past safety violations and correction of previous shortcomings.

**28.** 49 U.S.C. § 1551(a)(4) (Supp. III 1979).

**29.** *Id.* § 1302(a)(2).

**30.** 49 U.S.C. §§ 1424–1425 (1976).

**31.** H.R.Rep.No. 1211, *supra* note 21, at 28–30.

tions.[32] The oversight report expressed concern that existing carriers might reduce their expenditures on safety precautions because of the financial pressures caused by deregulation[33]; it urged the FAA to "insure that it has clear regulatory power to prevent any modification in air carrier operating practices that might decrease aviation safety."[34] The report also noted that commuter airlines, then subjected to lower FAA safety standards than regular air carriers, would expand their share of the market under deregulation.[35] To avoid a decline in safety levels it therefore recommended that the FAA should "insure that commuter airline passengers are provided a level of safety equivalent to that provided air carrier passengers."[36] The provision regarding commuter airlines was enacted into law as part of the 1978 Act.[37]

Second, the "highest degree of safety," recited in Section 1302(a)(2), is part of the FAA's regulatory mandate under existing law.[38] The House oversight report clearly stated that assuring this level of safety for new entrants was the responsibility of the FAA:

> The committee's primary concern is to insure that, if regulatory reform is enacted as proposed, the only new entrants allowed into the air carrier market will be those that can achieve and maintain the highest possible level of safety. As the subcommittee chairman pointed out on

September 8, 1977, the only proper way to ensure that is through stringent FAA regulation[.][39]

The House report on the 1978 legislation, the best source of legislative history for Section 1302(a)(2),[40] thus recognized the centrality of the FAA in the field of safety. It expressed concern that the FAA's resources and regulations were not yet adequate to deal with the safety implications of deregulation, and proposed measures to improve the FAA's safety surveillance capacity.[41] It did not in any way suggest that, because of the FAA's shortcomings, the CAB should be required to undertake a second level of safety review or that the CAB should insist on compliance with a new, more stringent, safety standard.

The Senate report, moreover, explicitly relied on the FAA to the exclusion of the CAB for protection of safety. "The Civil Aeronautics Board," the Senate committee declared, "regulates only airline economics—routes airlines fly and the fares they charge, whereas the Federal Aviation Administration within the Department of Transportation exercises regulatory control over airline and all aviation safety practices * * *." Economic deregulation, the committee added, would "not have any negative impact on the superb safety record of the U.S. airline system" because the bill "does not affect the obligations of the FAA to

**32.** H.R.Rep.No. 930, *supra* note 24.

**33.** *Id.* at 18–21, 31–32.

**34.** *Id.* at 32.

**35.** *Id.* at 24–29.

**36.** *Id.* at 32.

**37.** 49 U.S.C. § 1389(c)(3) (Supp. III 1979).

**38.** The FAA is required to "give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest and to any differences between air transportation and other air commerce[.]" 49 U.S.C. § 1421(b) (1976).

**39.** H.R.Rep.No. 930, *supra* note 24, at 21.

**40.** The language of the declaration of policy with regard to safety reflects the proposed language of the House bill more closely than that of the Senate bill. *Compare* 49 U.S.C. § 1302(a)(1)–(2) (Supp. III 1979) *with* H.R. Rep.No. 1211, *supra* note 21, at 38 (House bill) *and* S.Rep.No. 631, *supra* note 9, at 6 (Senate bill).

**41.** H.R.Rep.No. 1211, *supra* note 21, at 28–30 (*quoting* H.R.Rep.No. 930, *supra* note 24). ALPA's brief stresses that the FAA in 1978 was giving "low priority" to new carrier certification. Petitioner's brief at 23. However, ALPA's source, H.R.Rep.No. 930, *supra* note 24, referred to allocation of personnel in the face of increasing workloads and indicated only that the "low priority" might lead to delays in new carrier certification; it did not mention any deterioration in standards. *Id.* at 33 (appendix based on interviews with FAA officials).

police the operations and maintenance practices of the industry * * *." [42]

Further light is shed on the meaning of the declaration of policy in Section 1302(a)(2) by another provision of the 1978 Act, Section 1307, which is derived largely from the Senate bill. The Senate agreed with the House, in the words of its proposed bill, that deregulation should "result in no diminution of the high standard of safety in air transportation attained in the United States" in 1978.[43] It afforded no basis, however, for ALPA's contention that the CAB is responsible for this outcome. Rather, the Senate sought to implement its safety goals by requiring the FAA to study the impact of deregulation on airline safety and to take appropriate measures to prevent a decline in safety.[44] The Senate linked the mandated FAA studies with the goal of maintaining air safety by requiring the FAA to follow up on its review by taking the steps necessary to "ensure that the high standard of safety in air transportation" attained in 1978 "is maintained in all aspects of air transportation in the United States." These requirements were adopted by the conference committee.[45]

Thus, Congress' concern about the "highest degree of safety" and the possible deterioration of safety procedures is directed at the FAA and implemented in two specific new provisions. First, the FAA is required to upgrade safety standards for commuter airlines using small planes.[46] Second, the FAA is directed to study the safety implications of deregulation and to take the steps necessary to maintain pre-1978 safety levels.[47] This concern is also reflected in recommendations to the FAA by its oversight committee in the House.[48]

Although the language of Section 1302(a) sets out factors for the CAB to consider, it does not derogate from primary FAA responsibility for safety standards and procedures. The CAB is one of the statutory recipients of the FAA's annual Section 1307(b) reports,[49] and it is instructed to give full consideration to FAA recommendations regarding new carrier applications.[50] Because these reports and recommendations must take into account the "highest degree of safety" and prevention of deterioration in safety procedures, these safety considerations are incorporated into CAB decisions which rely on FAA assessments. Moreover, the CAB's independent determinations regarding economic factors and compliance attitudes contribute to the "highest degree of safety" in air transportation.[51] The CAB's certification policy takes safety factors into account within the limits of the agency's capacity and expertise.[52] We de-

---

**42.** S.Rep.No. 631, *supra* note 9, at 53.

**43.** *Id.* at 8 (proposed text of statute); *see id.* at 54.

**44.** *Id.* The House bill, as amended on the floor of the House, required the FAA to conduct annual safety studies. *See* H.R.Rep.No. 1779, *supra* note 21, at 59 (conference report). The substantive requirements of the two bills were combined in § 1307. 49 U.S.C. § 1307 (Supp. III 1979).

**45.** *See* 49 U.S.C. § 1307 (Supp. III 1979).

**46.** *Id.* § 1389(c)(3).

**47.** *Id.* § 1307.

**48.** H.R.Rep.No. 930, *supra* note 24; *see* text at notes 32 to 36 *supra.*

**49.** 49 U.S.C. § 1307(c) (Supp. III 1979).

**50.** *Id.* § 1302(a)(1).

**51.** The CAB's notice of proposed rulemaking regarding data reporting requirements for fitness determinations, 45 Fed.Reg. 42593 (1980), makes clear that the Board does not ignore safety-related issues which it is qualified to address:

> [W]e are aware of our statutory responsibility to consider the assignment and maintenance of safety as the highest priority in air commerce, but we cannot ignore the fact that direct responsibility for air safety rests with the FAA. We will not defer to the FAA in areas which are clearly within our purview, but we will rely on the FAA's technical expertise to tell us whether an operating carrier is safe.

*Id.* at 42595.

**52.** ALPA seeks to impose technical safety responsibilities upon the CAB because "there is no adjudicatory forum at the FAA in which to receive evidence and in which an interested intervenor may test that evidence and offer its own in support or in rebuttal." Petitioner's

cline ALPA's invitation to change the standards to be applied by the CAB during the period of transition to deregulation.[53]

The Second Circuit has taken the same position. Primarily on the strength of practical and institutional considerations, it recently rejected ALPA's statutory interpretation of the 1978 Act. In *Air Line Pilots Ass'n, Internat'l v. CAB*, 643 F.2d 935 (2d Cir. 1981), the Court of Appeals held that "Congress did not modify in any way the substance of the fitness requirement * * *." It added, "We find nothing in the legislative history of the Deregulation Act to support petitioners' view. It would be in our judgment unreasonable to suppose that the Congress, which * * * determined that the CAB be completely phased out as an agency by January 1, 1985, was at the same time vesting it with jurisdiction it had consistently eschewed." [54]

## III. CONCLUSION

Congress did not intend, by reemphasizing safety in the Airline Deregulation Act of 1978, to alter the existing allocation of responsibility between the CAB and the FAA. We join with the Second Circuit in rejecting the statutory interpretation proposed by ALPA. In all other respects the

reply brief at 2. However, without technical expertise the CAB is not properly equipped to adjudicate the issues ALPA seeks to raise in certification proceedings. Congress did not choose to provide an adjudicatory forum on technical safety issues.

53. In addition to suggesting its own standard, ALPA challenges the variable standard of safety applied by the CAB in its review of all-cargo applications. In No. 80–1168, Fleming International Airways, the CAB wrote that the Act did not require the "same level and degree of operational capability by all classes and levels of carriers regardless of the nature and scope of their operations." Order Declining Discretionary Review, JA 232. ALPA charges that this analysis is "wholly inadequate," because the statute does not refer to various "levels and degrees" of minimum fitness. Petitioner's brief at 25. We find, however, that the Act does authorize variable standards, because it allows CAB reliance on FAA determinations regarding operational safety. The FAA is specifically authorized to "make classifications of such standards, rules, regulations, and certificates appropriate to the differences between air transpor-

CAB's decisions are also free of reversible error. Accordingly, the orders of the CAB are

*Affirmed.*

54. *Air Line Pilots Ass'n, Internat'l v. CAB*, *supra* note 4, 643 F.2d at 939. The Second Circuit also chastised the CAB for deferring to a wholly conclusory letter, devoid of factual discussion, from an FAA official to the CAB, which was written before FAA certification and stated only that the FAA did not oppose CAB certification. The court noted that § 1302(a)(1) requires "full evaluation of the recommendations of the Secretary of Transportation * * *." *Id.*, 643 F.2d at 939. However, this section of the Second Circuit opinion does not support ALPA's position in our case. In the three cases under review the CAB received much fuller information from the FAA, which had monitored previous cargo operations by all three carriers, and the CAB coherently explained its reliance on the FAA's conclusions. We find that the Board's consideration of the FAA's recommendations in this case complied with § 1302(a)(1).